**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Armando ALVAREZ–LOPEZ,
Defendant-Appellant.**

No. 76–1257.

United States Court of Appeals,
Ninth Circuit.

Aug. 25, 1977.

Eric L. Henrikson, argued, Henrikson & Gee, Oakland, Cal.; for defendant-appellant.

Sandra J. Wittman, Asst. U. S. Atty., on the brief, Terry J. Knoepp, U. S. Atty.,

Barton C. Sheela, III, Asst. U. S. Atty., San Diego, Cal., argued for plaintiff-appellee.

Before KOELSCH and HUFSTEDLER, Circuit Judges, and FOLEY,* District Judge.

HUFSTEDLER, Circuit Judge:

Armando Alvarez-Lopez ("Alvarez") appeals from his conviction for conspiracy to possess and possession of heroin in violation of 21 U.S.C. §§ 846, 841(a)(1). The question on appeal is whether the district court committed prejudicial error in refusing to permit Alvarez to inquire into the Government's star witness' prior arrest for smuggling narcotics. Following *Alford v. United States* (1931) 282 U.S. 687, 51 S.Ct. 218, 75 L.Ed. 624, and its progeny, we hold that the curtailment of cross-examination was prejudicial error of constitutional dimension requiring reversal.

The Government's case against Alvarez depended heavily upon the testimony of Rocky Gentile, a Government informant, who was paid by the Government to "make" cases against persons who were engaged in narcotics trafficking. Gentile described himself as an undercover special employee of the DEA, working for DEA Agent Williams. In the course of that employment, Gentile was paid contingent fees when his undercover work resulted in arrests. The amount that Gentile was paid varied with the quantity of drugs seized and the number of people arrested. For this particular case, the DEA paid Gentile $1,000.

According to Gentile's testimony, Gentile met with codefendant Sanchez sometime in early October, 1975, and Sanchez told Gentile that he had a connection in Mexicali, Mexico, for heroin which he could supply to Gentile. Arrangements were made between the two men for a sale of heroin in Oceanside, California, on October 6, 1975, to a buyer to be produced by Gentile. On October 6, Sanchez drove to Oceanside with Alvarez. Sanchez went inside a restaurant where Gentile was waiting for him. The two men went back to a truck (later identified as belonging to Alvarez' father), where Sanchez introduced Alvarez to Gentile. This was the first time that Gentile had ever met or even heard of Alvarez. Sanchez then produced an ounce of heroin from the glove compartment of the vehicle, and Alvarez produced four ounces of heroin from under the seat. After he saw the heroin, Gentile called Agent Williams, who then came to the restaurant posing as a buyer. Williams was introduced to Alvarez and Sanchez, saw the heroin, and made the arrest.

Alvarez and Sanchez' versions were quite different. According to Sanchez, Gentile repeatedly importuned him to get involved in a money-making scheme. Sanchez finally agreed to meet Gentile on October 6, 1975, in a bar in Santa Monica, to leave the car parked for a while, and then to meet Gentile in Oceanside. Sanchez got Alvarez to drive him on the errand because Sanchez' own car was inoperative. At the appointed bar, they were met by a man named "El Chocolate," who the two defendants thought was a relative of the informant. Both left the car for a while, and after they returned, they then drove to Oceanside. When they met Gentile in Oceanside, Gentile took the packages out of the glove compartment, smelled them, and told the men that they had just delivered heroin. After Gentile summoned Agent Williams, Gentile directed the agent to the heroin. Neither Alvarez nor Sanchez ever handled the heroin in Williams' presence, a fact corroborated by Agent Williams' testimony.[1]

---

* Honorable Roger D. Foley, Chief Judge, United States District Court, District of Nevada, sitting by designation.

1. The picture is somewhat further confused by testimony of Sanchez at the time of trial denying a pretrial confession that was attributed to him, which, in part, had implicated Alvarez. Sanchez later changed his plea, and again changed his story.

In response to a question on direct examination by the prosecuting attorney, Gentile testified that he had been convicted of smuggling aliens, a felony. The prosecutor then asked him, "You had never been arrested with anything to do with narcotics?" Gentile answered, "No." At that juncture, out of the jury's presence, Alvarez' counsel requested production of Gentile's "rap sheet," which had earlier been promised to him. The prosecuting attorney responded that he did not have "the rap sheet here, but as I understand it, he had been charged with smuggling aliens. At least, that's to the best of my knowledge and that there are no narcotics arrests." Defense counsel said "there might be some other arrests and I think we should be entitled to know about that. This all might go for the motive for his role as a Government informant." Upon the representation of the prosecuting attorney that Agent Williams would bring the rap sheet, and upon defense counsel's request to keep Gentile available until the rap sheet was produced, the court suggested that the trial proceed.

On cross-examination, Alvarez' counsel asked Gentile about the circumstances under which he went to work for Agent Williams. Gentile replied: "Well, I don't like drugs. I have seen too many people get all goofed up on drugs. I have seen too many young kids and I had a friend of mine and he is a customs agent and so I told him about it. He introduced me to Bob Williams."

The rap sheet thereafter furnished revealed a long list of Gentile's arrests and some convictions. The only recent conviction was in 1972 for smuggling aliens, but the sheet also disclosed that Gentile was arrested by customs agents in 1971 for smuggling heroin. The 1971 case was labeled "dismissed," for undisclosed reasons. In a discussion *in camera* concerning further cross-examination of Gentile based on the rap sheet, the court indicated that it would not permit defense counsel to inquire into any felony convictions older than ten years, and the court also said, "I do not intend to let you inquire into anything that did not result in a conviction." The court added: "I would have to assume that there was not a conviction for some of those. I am not going to let you go into it. On cross-examination he said that he had no felony convictions and that is as far as it is going to go." Defense counsel argued that he should be entitled to impeach Gentile upon "the contradictions," and "the motive of Mr. Gentile's involvement in this case and his credibility insofar as his testimony on direct examination in the Government's case in chief and also after having been called by—." At this juncture, the court intervened, indicating that the court had ruled on the point and that the trial must proceed.

Alvarez' counsel then called Gentile, seeking to explore the inconsistencies in Gentile's testimony that had been revealed by the rap sheet. He attempted to impeach Gentile while trying to stay within the bounds of the court's ruling. He was stopped by the court. Gentile denied that he had discussed his earlier testimony with Government counsel; however, he volunteered that he misunderstood one of the questions. Defense counsel asked him which question he had misunderstood. The witness responded, "I may have misunderstood when I had an arrest before—I thought it was for wetbacks." Defense counsel asked him if his earlier response that he had been convicted for one felony was not correct. The witness responded affirmatively. The following colloquy then occurred."

"Q. Sir, you also I believe, indicated in response to a question of mine how you came to get into the business of working for Mr. Williams and that you were troubled by people using heroin? Is that correct?

"A. That's right.

"Q. Up until that time had you been involved in narcotics in any way?

"A. Yes.

"Q. Could you tell us, sir, what your involvement in narcotics was?

"[Prosecuting attorney]: Your Honor, I don't see the relevance of the past involvement?

"The Court: Objection sustained.

"Q. [By defense counsel] Apart from working with Mr. Williams in the past eight or nine months, have you had any other activities in the area of narcotics?

"A. No."

In restricting defense counsel's inquiry into Gentile's criminal record, particularly his arrest for narcotics smuggling, the district court applied the principles of Rule 609 (limitations upon impeachment by evidence of conviction of crime) and Rule 404(b) (limiting the use of other crimes, wrongs, or bad acts for impeachment purposes) of the Federal Rules of Evidence. Neither rule is applicable in this context. This case does not involve rules of impeachment or impeachment of a witness by collateral means. Moreover, it does not involve the rules of general impeachment applicable to cross-examination of a defendant in a criminal case who has taken the stand. The Evidence Code does not attempt to write a catalog of all the rules which govern evidence that can be used to impeach a witness. Rather, the code only attempts to lay down a few specific rules dealing with the situations in which impeachment upon collateral matters may be particularly subject to potential abuse, and, in those situations, to give substantial discretion to the trial court in admitting or excluding the impeaching evidence. (*See, e. g.,* Notes of Advisory Committee on Proposed Rules, Federal Rules of Evidence, 28 U.S.C.A. at pp. 87–88 (Note on Rule 402) and p. 109 (Note on Rule 404) (1975).)

Inquiries which defense counsel was prevented from making involved neither general nor collateral matters. Defense counsel was not attempting to use a prior felony conviction for the purpose of general impeachment. The questions were directed very specifically to the testimony that the prosecution had elicited from Gentile on direct. Cross-examination into the truth of the statements that had thus been elicited by the prosecutor could not be foreclosed either by an invocation of Rule 609 or Rule 402. Even if the Rules of Evidence were applicable in this situation, the prosecutor's effort to foreclose attack on the testimony which he himself had elicited from Gentile could no more be successful than an attempt by a defendant, who has chosen to take the stand, to prevent the prosecutor from cross-examining him about prior arrests or convictions when he has testified on direct examination that he has had neither.

Even if Gentile had not specifically testified on direct examination that he had not been involved in any narcotics offenses, the restriction imposed upon defense counsel in this case would have been prejudicial error of constitutional dimension based upon a series of Supreme Court decisions beginning with *Alford v. United States* (1931) 282 U.S. 687, 51 S.Ct. 218, 75 L.Ed. 624. In *Alford*, a Government witness gave damaging testimony about transactions with the defendant. On cross-examination, defense counsel asked the witness about his place of current residence. The court sustained the Government's objection that the question was immaterial and not proper cross-examination because it had not been the subject of direct examination. Outside the presence of the jury, defense counsel told the court that he had heard that the witness was then in custody of federal authorities and that he should be entitled to bring out that fact on cross-examination "for the purpose of showing whatever bias or prejudice he may have." (282 U.S. at 690, 51 S.Ct. at 219.) The court adhered to its previous ruling, stating that defense counsel was limited to inquiring about convictions for a felony. The United States Court of Appeals for the Ninth Circuit affirmed on the ground that no abuse of discretion had been shown in foreclosing that line of inquiry, and the error, if any, was not shown to be prejudicial. The Supreme Court reversed, holding that curtailment of cross-examination under these circumstances was prejudicial error, without regard to whether the defendant was able to show any specific harm caused by the district court's ruling.

Mr. Justice Stone, speaking for a unanimous Court, stated:

". . . It is the essence of a fair trial that reasonable latitude be given the cross-examiner, even though he is unable to state to the court what facts a reasonable cross-examination might develop. Prejudice ensues from a denial of the opportunity to place the witness in his proper setting and put the weight of his testimony and his credibility to a test, without which the jury cannot fairly appraise them. [Citations omitted]

". . .

". . . [The fact that the witness was then in custody] could be brought out on cross-examination to show whatever bias or prejudice the witness might have. The purpose obviously was not, as the trial court seemed to think, to discredit the witness by showing that he was charged with crime, but to show by such facts as proper cross-examination might develop, that his testimony was biased because given under promise or expectation of immunity, or under the coercive effect of his detention by officers of the United States, which was conducting the present prosecution. . . . Even if the witness were charged with some other offense by the prosecuting authorities, petitioner was entitled to show by cross-examination that his testimony was affected by fear or favor growing out of his detention. [Citations omitted]" (282 U.S. at 692–93, 51 S.Ct. at 219–220.)

The constitutional basis for the *Alford* ruling, implicit in the *Alford* opinion, was made explicit in *Smith v. Illinois* (1968) 390 U.S. 129, 88 S.Ct. 748, 19 L.Ed.2d 956 ("Even more recently we have repeated that 'a denial of cross-examination without waiver . . . would be constitutional error of the first magnitude and no amount of showing of want of prejudice would cure it.' *Brookhart v. Janis*, 384 U.S. 1, 3, 86 S.Ct. 1245, 16 L.Ed.2d 314." (390 U.S. at 131, 88 S.Ct. at 749–750.).) *Alford* was also followed in *Davis v. Alaska* (1974) 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347. The *Davis* case is particularly instructive. There, a crucial prosecution witness was

Green. The state prosecutor obtained a protective order to prevent any reference to Green's juvenile record by the defense in the course of cross-examination. Defense counsel made it clear that he was not trying to introduce the juvenile record as general impeachment of Green's character as a truthful person, but rather, to show specifically that at the same time that Green was helping the police to identify Davis, Green himself was on probation for burglary. The purpose was to show Green's bias and prejudice, and not to call Green's good character into question. Although defense counsel was thereby prevented from inquiring about Green's probationary status, he did ask Green on cross-examination: "Had you ever been questioned like that before by any law enforcement officer?" The witness answered, "No."

In reversing the conviction for violation of Davis' Sixth Amendment guarantee of the right of confrontation, Chief Justice Burger, writing for the Court, said:

". . . Since it is probable that Green underwent some questioning by police when he was arrested for the burglaries on which his juvenile adjudication of delinquency rested, the answer can be regarded as highly suspect at the very least. The witness was in effect asserting, under protection of the trial court's ruling, a right to give a questionably truthful answer to a cross-examiner pursuing a relevant line of inquiry; it is doubtful whether the bold 'No' answer would have been given by Green absent the belief that he was shielded from traditional cross-examination. It would be difficult to conceive of a situation more clearly illustrating the need for cross-examination." (415 U.S. at 314, 94 S.Ct. at 1109.)

Chief Justice Burger explained the difference from a general attack upon the witness' character for the purpose of attacking his credibility by use of a prior criminal conviction, as:

". . . A more particular attack on the witness' credibility is effected by

means of cross-examination directed toward revealing possible biases, prejudices, or ulterior motives of the witness as they may relate directly to issues or personalities in the case at hand. The partiality of a witness is subject to exploration at trial and is 'always relevant as discrediting the witness and affecting the weight of his testimony.' [citation omitted] We have recognized that the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination. *Greene v. McElroy*, 360 U.S. 474, 496, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959)." (415 U.S. at 316–17, 94 S.Ct. at 1110.) (footnote omitted)

The *Davis* Court rejected the Alaskan Supreme Court's conclusion that the rather extensive cross-examination that was permitted was adequate to develop the bias issue:

". . . While counsel was permitted to ask Green *whether* he was biased, counsel was unable to make a record from which to argue *why* Green might have been biased or otherwise lacked that degree of impartiality expected of a witness at trial. . . . On these facts it seems clear to us that to make any such inquiry effective, defense counsel should have been permitted to expose to the jury the facts from which jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness. Petitioner was thus denied the right of effective cross-examination which 'would be constitutional error of the first magnitude and no amount of showing of want of prejudice would cure it.' [Internal quotations omitted, and citations omitted.]" (415 U.S. at 318, 94 S.Ct. at 1111.) (italics in original)

■ Extensive cross-examination of a Government witness designed to reveal any biases or prejudices of the witness is compelled by the confrontation clause. Especially should great latitude be allowed when, as here, the key prosecution witness is also a professional informant. Deprivation of this full and robust right of cross-ex-

amination cannot be excused for lack of any showing of specific prejudice by the defendant, the error in restricting cross-examination cannot be cured by a later extraction of some of the evidence defense counsel sought to adduce from his full examination that was improperly curtailed by the court. (*Davis v. Alaska, supra. Accord United States v. Croucher* (5th Cir. 1976) 532 F.2d 1042 (similar curtailment of cross-examination of Government informant, denial of the Sixth Amendment's confrontation clause); *United States v. Garrett* (6th Cir. 1976) 542 F.2d 23 (similar curtailment of cross-examination of Government's star witness). *Cf. Johnson v. Brewer* (8th Cir. 1975) 521 F.2d 556 (state court's curtailment of cross-examination of professional informant denied both right of confrontation and due process of law). *See also Azbill v. Pogue* (9th Cir. 1976) 534 F.2d 195, 197.)

REVERSED AND REMANDED FOR A NEW TRIAL.