RUSSELL E. SMITH, District Judge:
Defendants Arnold Price, Charles R. Mitchell, William P. Mitchell, and Bobbi Mitchell were convicted of a conspiracy to transport two women, Shelly and Debbie,[1] in interstate commerce for purposes of prostitution, and Charles R. Mitchell was convicted of transporting Debbie from Washington to Oregon for purposes of prostitution.
Because of the confrontation problem arising as to Charles Mitchell, we set out the evidence supporting the conviction in more detail than ordinarily would be necessary. The detail is necessary to disclose, as to Charles Mitchell, the overwhelming nature of the evidence.
William P. Mitchell and his wife, Bobbi Mitchell, owned and operated Daisy Mae’s Massage Parlor in Anchorage, Alaska. William Mitchell told a police officer of his ownership. It was stipulated that checks drawn on the account of Bobbi Mitchell and William Mitchell, signed by William Mitchell, were issued in payment of the earnings of female employees of the massage parlor. Bobbi Mitchell, in a taped conversation with Shelly and Debbie, implicated William Mitchell in the operation of the business. In the same taped conversation she revealed that the parlor was operated for purposes of prostitution. The conversation was lengthy and explicit in sexual detail. William Mitchell and Charles Mitchell were brothers, and telephone records show that there was communication over the telephones listed to Daisy Mae’s Massage Parlor and Bobbi Mitchell in Anchorage and the telephone listed to Charles Mitchell in Vancouver, Washington.
In June 1976 Charles R. Mitchell told his friend Arnold Price of Daisy Mae’s Massage Parlor and stated that anyone working there could make good money. He asked Price to let him know if he found anyone who would be interested in working in the massage parlor. This is proven not only by *1359 the statements of coconspirator Price, but by Price’s testimony, given when he took the stand in his own behalf, and that testimony is corroborated by all of the subsequent happenings. Price, while employed by CETA, learned from Shelly, a fellow worker at CETA, that she had at one time been a prostitute. On July 26, 1976, while Shelly was visiting the CETA offices, Price advised her of the Alaskan massage parlor and told her that she could make $1,000 to $2,000 a month working there. Shelly said that she was interested and asked Price if he would arrange a meeting with his friend. Shelly advised her friend Debbie of the proposal, and then Debbie called Price and asked if she also could meet his friend. Price said “yes.” These facts were proved by the testimony of Shelly, Debbie, and Price. Price’s testimony as to his conversation with Shelly was as follows:
A I don’t remember exactly what was said but then I suggested to her that if she was interested in working in a sauna in Alaska, that she might want to check with a friend of mine.
Q And what was her response?
A She sort of raised her eyebrows and said, “That sounds interesting,” and that was about all.
Q Now at that time did you say anything regarding the amount one could earn or whether prostitution was part of it?
A I believe I said she could make, maybe, $1,000 or $2,000 a month, or something like that. I don’t remember exact figures.
Q Did you say anything about prostitution?
A I said, when I mentioned working in the sauna, she said, “Doing what?” and I said, “Whatever,” or “Tricks,” you know, “Turning tricks.”
Q What did you mean when you said “turning tricks”?
A I meant prostitution.
Unbeknownst to Price, Shelly, who had been in marijuana trouble, was cooperating with the county drug enforcement officers. She advised the sheriff’s office of Price’s proposal. The sheriff’s office in turn advised the FBI, and ultimately Shelly was asked to pursue the matter. Shelly called Price to arrange a meeting to discuss his offer. Price took Shelly and Debbie to Mitchell’s house on August 5, 1976. The fact of this meeting at Charles Mitchell’s house was proved by the testimony of Shelly, Debbie, and Price, and surveilling officer Smith. Smith took pictures of the women, Price, Price’s car, and the Charles Mitchell house. That the meeting took place and that the conversation (not taped) related to Alaska is corroborated by a note shown to be in Charles Mitchell’s handwriting and given by him to Shelly. The note bears Charles Mitchell’s name, address, phone number, and the word “Alaska.” After the meeting, Shelly delivered the note to the officers, who initialed it and dated it August 5th, 1976.
On August 9th, in a taped telephone call to Price, Shelly made arrangements with Price to have him take her back to Charles Mitchell’s house. A meeting at Charles Mitchell’s house, attended by Debbie, Shelly, and Mitchell, occurred on August 11th. The conversation at that meeting, which revolved about the trip to Alaska, was taped.[2] On August 12th, Debbie, in a taped telephone conversation with Charles Mitchell, discussed the trip to Alaska and ar *1360 ranged a meeting at Charles Mitchell’s house on that evening.[3] The meeting was held, and the entire conversation was taped.[4] The trip to Alaska was discussed in *1361 detail, and arrangements were made for the women to meet at Charles’ house the next morning. That same evening, and after the meeting, there was another taped telephone conversation[5] between Debbie and Charles Mitchell in which the final arrangements for the transportation to Portland were made. Charles Mitchell took both women from Vancouver, Washington, to the Portland airport on August 13th. The fact of the trip is proved by Shelly and Debbie and corroborated by the testimony of a surveil-ling officer. Debbie testified that Charles Mitchell gave Shelly three hundred-dollar bills. By airlines personnel it was proved that two girls and a man approached the airlines counter, that one of the girls bought two tickets to Anchorage, Alaska, with three hundred-dollar bills. At the request of an officer, the airlines personnel segregated the ticket coupon and the bills. They were admitted in evidence.
Shelly and Debbie boarded the aircraft and met an FBI agent in Seattle who made reservations for them in Anchorage. In Anchorage, on August 13th, they called Bobbi Mitchell, who came to their hotel room. The business of the massage parlor was thoroughly discussed, and the taped conversation shows unequivocally that Bobbi Mitchell expected Shelly and Debbie to report for work as prostitutes on the morning of the 14th. They did not report, but rather returned to Vancouver the next morning.
It is against this background that we discuss the assigned errors.
■ CROSS-EXAMINATION AND CONFRONTATION:
Charles Mitchell argues that the judgment should be reversed as to him because his cross-examination of Shelly was improperly limited and his constitutional right to confront her was thereby denied.
After Shelly’s first conversation with Price, she called Vic Calzaretta, the chief criminal deputy in the sheriff’s office. Later she met with Calzaretta and John Dush, an officer in the narcotics unit. The cross-examination of Shelly was limited as follows:
*1362 Q Had you ever worked in any capacity providing information such as that to Mr. Dush or to the individuals in the narcotics unit? .
MR. MOORE: Objection, Your Honor.
THE COURT: Read the question. (Preceding question read by the reporter.)
THE COURT: What is the purpose?
MR. KANEV: Your Honor, for some reason, as the witness pointed out, she was met not by MR. Calzaretta whom she telephoned, but by individuals of the narcotic unit.
THE COURT: So?
MR. KANEV: This line of questioning would go to her interest in the matter.
THE COURT: Sustained.
The defendant Charles Mitchell had the right to explore the relationship between the witness and the law enforcement officers (Davis v. Alaska, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974); United States v. Callahan, 551 F.2d 733 (6th Cir. 1977); United States v. Garrett, 542 F.2d 23 (6th Cir. 1976; United States v. Croucher, 532 F.2d 1042 (5th Cir. 1976); United States v. Harris, 501 F.2d 1 (9th Cir. 1974); United States v. DeLeon, 498 F.2d 1327 (7th Cir. 1974)), and the cross-examination was limited improperly.
Charles Mitchell’s cross-examination of Shelly was limited, but the fact is that Shelly’s relationship with the police was explored fully. On cross-examination by counsel for William and Bobbi Mitchell, Shelly testified that she had been arrested for possession of marijuana on May 20, 1976; that following a hearing the charge was dropped; that she was friendly with John Dush, the narcotics officer, had worked for him, and had received expense reimbursement in the amount of $34.00. It also appeared that, at the time of the events in this case, she was under a subpoena to testify before a court but that she had never had to appear. Officer Dush testified that Shelly had been a confidential informant for the narcotics division of the sheriff’s office for about three months prior to events in this case and had worked on seven to nine heroin cases. Dush was fully cross-examined as to the relationship between Shelly and the narcotics division. We also note that Debbie, whose background was similar to Shelly’s, was fully cross-examined as .to her relationship with the officers.
The evidence against Charles Mitchell, consisting of documentary evidence, several taped conversations, and the testimony of many witnesses who corroborated each other on most of the facts in the case, was overwhelming. Considering this and the ultimate disclosure of Shelly’s relationship to the police, we believe the limitation of her cross-examination was harmless error beyond any reasonable doubt.
The harmless error rule may apply even when the error stems from a violation of the Constitution. For many years the harmless error rule has been stated by statute[6] and by court rule.[7] In 1967, in the case of Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705, the Supreme Court, after noting the statute and the court rule, consciously and deliberately examined the harmless error rule in its relationship to violations of constitutional rights and established the applicable law. The rule was stated as follows:
[BJefore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt.
In 1968, in Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476, the Supreme Court ruled that admission of extrajudicial confessions of codefendants violated the right of cross-examination secured by the confrontation clause of the sixth amendment, and then in 1969, in Harrington v. California, 395 U.S. 250, 89 S.Ct. *1363 1726, 23 L.Ed.2d 284, the Court reaffirmed Chapman and held that the harmless error rule was applicable in sixth amendment cases of the Bruton type. In affirming the conviction, the Court said at 254, 89 S.Ct. at 1728:
We do not depart from Chapman ; nor do we dilute it by inference. We reaffirm it. We do not suggest that, if evidence bearing on all the ingredients of the crime is tendered, the use of cumulative evidence, though tainted, is harmless error. Our decision is based on the evidence in this record. The case against Harrington was not woven from circumstantial evidence. It is so overwhelming that unless we say that no violation of Bruton can constitute harmless error, we must leave this state conviction undisturbed.
Now the problem arises — is the harmless error rule announced in Chapman inapplicable where the sixth amendment comes into play by reason of a limitation of cross-examination rather than by the reception in evidence of an extrajudicial confession of eodefendant?
In 1974, in Davis v. Alaska, 415 U.S. 308, 318, 94 S.Ct. 1105, 1111, 39 L.Ed.2d 347, the Supreme Court said:
On these facts it seems clear to us that to make any such inquiry effective, defense counsel should have been permitted to expose to the jury the facts from which jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness. Petitioner was thus denied the right of effective cross-examination which “ ‘would be constitutional error of the first magnitude and no amount of showing of want of prejudice would cure it.’ Brookhart v. Janis, 384 U.S. 1, 3, 86 S.Ct. 1245, 16 L.Ed.2d 314.” Smith v. Illinois, 390 U.S. 129, 131, 88 S.Ct. 748, 19 L.Ed.2d 956 (1968).
(Emphasis supplied.)
The precise question is whether the emphasized language was intended to make the rule of Chapman inapplicable in all cases where there has been an erroneous limitation of cross-examination, or whether the Court was referring to the specific limitation in Davis v. Alaska, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974), and holding that that limitation could not be harmless.
It is noted that the emphasized language in the quotation was taken from Brookhart v. Janis, 384 U.S. 1, 3, 86 S.Ct. 1245, 16 L.Ed.2d 314 (1966). The issue in Brookhart was one of waiver. The emphasized language was not a holding by the Court in Brookhart that any limitation of the right of cross-examination was reversible error. It was nothing more than a quotation from an admission by the respondent in Brook-hart that, absent a valid waiver, the error, i. e., a denial of all right of cross-examination, was one of great magnitude. Obviously, the denial of all right of cross-examination cannot be harmless.
There was no need for the Court in Davis v. Alaska, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974), to modify the rule of Chapman and establish a per se rule to achieve the result obtained. The case against the defendants in Davis depended almost entirely on the testimony of a juvenile delinquent named Green. He was, as the Court said, a “crucial witness,” and it is evident from the opinion that without his testimony there could not have been a conviction. The cross-examination would have explored his relationship to the law officers and may have revealed some bias resulting from that relationship. In addition, it may have resulted in his impeachment. When the Court found that the right of “effective cross-examination” had been denied and that this error was clearly prejudicial, the harmless error rule of Chapman could not be applied. We think the same may be said of the language used in United States v. Harris, 501 F.2d 1, 9 (9th Cir. 1974), and United States v. Alvarez-Lopez, 559 F.2d 1155, 1160 (9th Cir. 1977).
The result we reach could not be reached by holding that there was not here, as in Davis and Harris, a denial of “effective” cross-examination. The fact that Shelly’s police relationships were explored by a co-defendant does not really relate to the effectiveness of the right afforded Charles *1364 Mitchell to cross-examine. Nor does the fact that the evidence against Charles Mitchell was overwhelming bear upon the effectiveness of the right to cross-examine afforded to Charles Mitchell. These facts do, however, bear upon whether any damage was done to him and may be considered if the harmless error rule is applied.
In most cases where there is a denial of effective cross-examination, it would be impossible to find the denial harmless, but in this case we think it is, and in the absence of any ease expressly renouncing the harmless error rule or any case mentioning it where a renunciation of it was necessary to the result,[8] we reach our result on the basis of Chapman. We agree with the reasoning of the Fifth Circuit in United States v. Mayer, 556 F.2d 245, 252 n. 10 (1977).

MARITAL PRIVILEGE:

The taped conversations of Bobbi Mitchell were received in evidence over the objection of her husband, William Mitchell, that his marital privilege[9] was being violated. The taped conversations of Bobbi Mitchell were extremely damaging, and if the privilege applies, the judgment must be reversed.
In the federal courts, the husband has a privilege to prevent his wife from testifying against him. Hawkins v. United States, 358 U.S. 74, 79 S.Ct. 136, 3 L.Ed.2d 125 (1958); Bisno v. United States, 299 F.2d 711 (9th Cir. 1961).
In the Ninth Circuit, as distinguished from others,[10] extrajudicial statements made by the wife are considered within the rule.[11] Notwithstanding, it is our view that the Bobbie Mitchell tapes were admissible against William Mitchell. Statements made by an agent in the course of his employment are the vicarious admissions of the principal. A conspirator is an agent in a criminal venture, and his admissions are likewise received against his co-conspirators. Where one spouse is shown to be an agent of the other, the vicarious admissions rule has been applied in both civil and criminal cases. 8 Wigmore on Evidence, McNaughton Revision § 2232, n. 3. The rule was specifically applied to a husband and wife venture in United States v. Pugliese, 153 F.2d 497 (2d Cir. 1945).[12]
*1365 Even if we conceive of the privilege as one based on the “persistent instincts of several centuries”[13] rather than a “sentimental relic,”[14] we doubt that much instinctive support could be found for the proposition that a man may engage in a civil or criminal venture with his spouse, and then, after she had said things which had to be said in the operation of the venture,[15] avoid responsibility for them on the basis of privilege which was initially rooted in the “legal fiction that [a] husband and wife were one person.”[16] The language of the Supreme Court in Hawkins clearly indicates that the privilege was respected because of the belief that it does foster “family peace.” In this sort of a ease, where the wife is not the witness and the wife’s words which are introduced are those which the husband authorized her to speak, it is difficult to see how the reception of the evidence could impair the relationship between the husband and the wife. We conclude that the rule should be that, where a husband and wife are engaged in a criminal conspiracy, the extrajudicial statements of either made in furtherance of the conspiracy may be admitted against the other.
SUFFICIENCY OF EVIDENCE — WILLIAM MITCHELL:
William Mitchell, urges that the statements of Charles Mitchell, Arnold Price, and Bobbi Mitchell should not have been admitted against him because there was not sufficient independent evidence to connect him with the conspiracy. As previously indicated, it was proved that William Mitchell had said that he was Bobbi Mitchell’s husband, that he had purchased Daisy Mae’s Massage Parlor and was in the massage parlor business. Bank records showing the account of William and Bobbi Mitchell were admitted as exhibits, as were checks signed by William Mitchell payable to four of the female employees of Daisy Mae’s Massage Parlor. This was sufficient to connect William Mitchell to the conspiracy. See United States v. Perry, 550 F.2d 524, 528 (9th Cir. 1977); United States v. Turner, 528 F.2d 143, 161-62 (9th Cir.), cert. denied, 423 U.S. 996, 96 S.Ct. 426, 46 L.Ed.2d 371 (1975).

SUFFICIENCY OF EVIDENCE-PRICE:

Price urges that the evidence was insufficient to prove Count 1 because there is no evidence that he intentionally entered into an agreement to cause women to be transported for purposes of prostitution. On the record here, the contention borders on the frivolous. The common purpose was to recruit girls for purposes of prostitution. He furthered that purpose. A common purpose and plan could be inferred from the circumstances.[17]

*1366
VOIR DIRE OF JURY:

Charles Mitchell requested the court on voir dire to instruct the jury on the presumption of innocence and burden of proof and to ask them whether they thought of such laws as being unfair. The trial court refused, and this refusal is assigned as error. The trial court did ask the jurors if they would follow his instructions as to the law. The jurors nodded in affirmation. At the close of the evidence, the jury was fully instructed as to the burden of proof, the presumption of innocence, and the defendants’ right to remain silent. The jurors were sworn to follow the law. The scope of the voir dire is directed to the sound discretion of the trial court,[18] and it is assumed that a jury will, in accordance with the oath they take, follow the judge’s instructions. Vitello v. United States, 425 F.2d 416 (9th Cir. 1970). On the specific questions here raised, the Sixth Circuit, in a divided opinion, held it error to refuse a request to voir dire the jury as to the presumption of innocence and the burden of proof. United States v. Blount, 479 F.2d 650 (6th Cir. 1973). The decision in Blount, a minority view, was specifically rejected by the Third Circuit in United States v. Wooton, 518 F.2d 943 (3d Cir.), cert. denied, 423 U.S. 895, 96 S.Ct. 196, 46 L.Ed.2d 128 (1975).[19] We adopt the rule stated in Woo-ton as the rule in this circuit.

PROSECUTORIAL UNFAIRNESS CONSTITUTING A DENIAL OF DUE PROCESS:

Defendants Price and Mitchell were charged in Count 1 of the indictment with conspiracy and in Counts 2 and 3 with inducing Shelly and Debbie respectively to be transported in interstate commerce for the purposes of prostitution. At the close of the Government’s case, and at the close of the evidence, Price and Mitchell moved for a directed verdict as to all counts. The motion was denied, and the court did instruct on Counts 2 and 3. The United States Attorney did not request the jury to convict on Counts 2 and 3, but did make perfunctory argument in support of Counts 2 and 3. At the conclusion of all the arguments, the United States moved to dismiss those counts. The motion was granted, and only Counts 1 and 4[20] were submitted. Price and Mitchell now urge that the United States deliberately confused and distracted the defendants by mentioning Counts 2 and 3 in the argument, but not asking for a conviction as to them; that the Government, for all practical purposes, sought a compromise verdict; that the Government improperly supported its own integrity by being candid as to Counts 2 and 3, and made its conspiracy ease stronger by arguing Counts 2 and 3. On a review of the record, we do not find the unfairness of which Price complains. As indicated, Counts 2 and 3 charged that defendants persuaded, induced, and enticed Shelly and Debbie to travel in interstate commerce for purposes of prostitution. The weakness, if any, in Counts 2 and 3 was not in a failure to prove defendants’ conduct. That was proved beyond any reasonable doubt, but the women testified that they had no intention of prostituting themselves in Alaska and that they were not persuaded by defendants to go there, but rather went because the law enforcement officers asked them to. Without passing on the question of whether the evidence was sufficient to warrant a conviction on Counts 2 and 3, we note that had Counts 2 and 3 been erroneously submitted to the jury that error would not, under the circumstances here, have warranted a reversal as to Count 1. All facts tending to support Counts 2 and 3 were admissible to prove Count 1[21] Had *1367 Counts 2 and 3 been submitted, defendants would have been required to argue them, and the jury would have had the opportunity to compromise, which they did not have when Counts 2 and 3 were dismissed. It may be that the United States Attorneys did improve their image of integrity by their candor in indicating the difficulties with Counts 2 and 3 and ultimately moving to dismiss them, but we are of the opinion that the United States Attorney owes a duty of candor, and the prosecution cannot be faulted here for fulfilling that duty. In short, there simply was not unfairness of the type condemned in Berger v. United States, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935).

DUE PROCESS:

Defendants Price and Mitchell assert error in the court’s refusal to instruct the jury on the “due process” defense.[22] This contention also borders on the frivolous. They are not in a position to assert entrapment, or the so-called “due process” defense, because the crime of conspiracy was complete when the first overt act in furtherance of it was committed. An overt act was committed when Price first discussed the Alaskan venture with Shelly, and at that time no police officer of any kind even knew of the conspiracy.
We have examined other assigned errors and find them to be without merit.
The judgments are affirmed.

. The first names of these witnesses are used to preserve, to the extent possible, their anonymity.

. The following are excerpts from the tape of the conversation at Mitchell’s home on August 11th:
Deborah: I thought we might like to go.
Arnie: You would. When would you like to go?
Deborah: Friday, maybe.
Charles: The end of the week? O.K. Maybe I’ll call tonight and make arrangements.
Shelly: Arnie, is there going to be somebody up there to meet us?
Charles: Yeah, you see, the whole thing to me is exciting. 1 mean it. The idea of a vicarious thrill I was in on, somebody flying away in something they don’t know. You know, all they got is a free ticket and promise of big money. — TR 131-32 and
Deborah: What if it’s — O.K., if it’s this type of job, how come they guarantee us a thousand to fifteen hundred dollars?
Charles: Well, that’s what the girls are making. They’re making a thousand to fifteen hundred.
*1360 Amie: That’s what they ask for. You just go up to your room.
Charles: I don’t know how they work it, to tell you the truth. I don’t know the details. I mean if I was a female, I would know every detail.
Shelly: Well, how much does a trick go for up there?
Charles: I don’t know, but see—
Arnie: You see, you have to get with somebody to find out what they are getting.
Deborah: That’s it.
Charles: Right. Well, it’s—
Deborah: But you can’t do that when you’re working out of a parlor or something, Ar-nie.
Arnie: Oh.
Charles: Yeah, there’s a set—
Deborah: They have a set price.
Charles: Yeah, I imagine it’s a hundred. — TR 140-41
and
Deborah: I was going to say, if there’s that much women going up there, how is he going to know which two to pick up?
Charles: Yeah, well, I don’t even know.
Amie: There’s a lot of them going up there.
Charles: Why don’t you tell him. I’ll just tell him I’ll work something out. I don’t know, I’ll call him and tell him you’re coming, or something. I’ll just tell him. I don’t know, I’ll call him and tell him you’re coming Friday or Saturday.
Deborah: Then do you want us to pick our tickets up at the airport, or—
Charles: Well, we have to do that this, this way. This might sound suspicious, but we do it this way because there is a legal hassle. What I will do, I will buy you the tickets. I’ll go to the airport with you, buy you the tickets, or give you the money and you go buy the tickets. Then I don’t know how that works one way or the other.
Debbie: Legal hassle?
Arnie: More like you give them the money to buy their own tickets.
Charles: Right.
Shelly: O.K.
Deborah: Oh, so, if—
Amie: So, if it ever comes down to it—
Deborah: You didn’t transport us. You just bought a ticket to Alaska at the airport.
Charles: Fine, that’s what it amounts to.— TR 145-46
and
Charles: Now, I call this guy and I say, “I’m sending a couple of girls up,” you know. “Do you need a couple more girls?” and he says, “Yeah,” he’s going to immediately think that, you know, he’s not going to give you the benefit of the doubt. He’s going to say, “Well, there’s a couple more prostitutes coming up here.”
Shelly: Uh, huh.
Charles: When he’s dealing with these people who are, you know, he’s been dealing with these people.
Deborah: Well, mention to him that we work together now, we’re team work. You know, so that’s a new thing for his place, too. — TR 162-63

. The following is an excerpt from the tape of the first telephone conversation of August 12th: -
Debbie: Did you talk to them, right?
Charles: Yes, it’s sort of up in the air. Can you go, could you leave tomorrow?
Debbie: Yes.
Charles: O.K.
Debbie: I’d like to leave early.
Charles: O.K., well, here’s how we have to do it. We have to do it this way. There’s a flight leaving at 2:25 and there’s one leaving at 5:25. Now I know it sounds strange but this is the way that I was instructed to do it. This is the way we’re gonna do it. One of you can go at 2:25 and the other one of you can go at 5:25. O.K.?
Debbie: All right.
Charles: It sounds strange, doesn’t it?
Debbie: Yes.
Charles: O.K. Well, if you’re afraid of that, I don’t blame you, but that’s the way it’s going to happen.
Debbie: Hum.
Charles: You see.
Debbie: Well,—
Charles: I know it sounds flaky, and I’ll explain to you exactly why it’s done this way, you see. I can explain it to you.
Debbie: O.K. Go ahead.
Charles: Well, I really don’t want to go into detail over the phone.
Debbie: Yes, true.
Charles: O.K.
Debbie: Could we come over maybe talk to you?
Charles: I’m leaving, I have to go show a house at 7:00 o’clock. You want to come by about 8:00?
Debbie: About 8:00 o’clock.
Charles: O.K., you come by about 8:00. O.K.? — TR 462-63

. The following are excerpts from the tape of the conversation at Mitchell’s home on August 12th:
Charles: . . . how old are you?
Debbie: Twenty-two.
Charles: And you’re? Twenty years old? You guys are just babies.
Shelly: Twenty.
Charles: I mean you’re just, you know, you look older than you are, really no offense.
*1361 Debbie: Well, I’ve been out on my own since I was fifteen.
Charles: Well, then. You know, I’m just trying to avoid, you know, the fucking feds coming and saying we got a warrant here for your arrest, you know, blah, blah, blah, got to call the bondsman, you know. Go through a bunch of bullshit. — TR 470 and
Debbie: . . O.K., now, Charles, be up. I’ll call you at — I’ll call you at 5:30 and wake you up, all right? O.K.? Put the phone by your bed or wherever you sleep. O.K., and that will be on Alaska Airlines 87, and we’ll arrive there at 5:35. So, don’t mention it here, like I said.
Charles: O.K., well, if that’s the way you want to do it.
Debbie: I just would, you know, when we first meet them, I’d like to be cleaned up and presentable, you know. I don’t want to walk in like a slob and have them say, “Wow, send these girls back.” Your know, we got to make it look good for you, too, Charles. We don’t want you sending no creeps up there.
Charles: I don’t do that. Yes, you know, “I’m sending a girl up,” and she gets off the plane — (laughter)
Debbie: I’m glad we got this straightened out. So, 5:30 in the morning to wake you up, ‘cause we have to be on our way, you know, to make that 7:20.
Charles: O.K. . . . — TR 489-90

. The following are excerpts from the tape of the second telephone conversation between Debbie and Mitchell on August 12th:
Charles: Hello.
Debbie: Charles?
Charles: Yes.
Debbie: This is Debbie.
Charles: Hi.
Debbie: Hi, we made it easier on you.
Charles: How?
Debbie: We called and I decided that, can we just take that 9:45 one? It’ll be the same thing, but we won’t have to spend so much time in Seattle that way.
Charles: O.K., then what time? Yeah, that’ll work.
Debbie: O.K. — TR 494 and
Charles: O.K. So what time should I look for you tomorrow?
Debbie: Let’s see, if it leaves at 9:45, we’ll be there probably—
Charles: 8:30.
Debbie: Does that sound good? About 8:30?
Charles: Fine, that’s work.
Debbie: Alrighty.
Charles: O.K., I’ll talk to you then.
Debbie: Alrighty. — TR 495

. “On the hearing of any appeal or writ of certiorari in any case, the court shall give judgment after an examination of the record without regard to errors or defects which do not affect the substantial rights of the parties.” 28 U.S.C. § 2111 (1959).

. “Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded.” Fed.R.Crim.P. 52(a).

. United States v. Brady, 561 F.2d 1319 (9th Cir. 1977), wherein it is said at 1320:
As the Government acknowledges, the restriction of a defendant’s right to cross-examine a government witness can be a denial of the defendant’s constitutional right of confrontation. (Davis v. Alaska, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974); Alford v. United States, 282 U.S. 687, 51 S.Ct. 218, 75 L.Ed. 624 (1931); United States v. Alvarez-Lopez, 559 F.2d 1155 (9th Cir. 1977).) We need not decide whether the error in this case was of constitutional dimension, however, because we are convinced that the error was prejudicial even if the confrontation threshold were not crossed,
and United States v. Ortega, 561 F.2d 803 (9th Cir. 1977), wherein it is said at 806:
Error in the restriction of a defendant’s cross-examination of a government witness has constitutional implications and, therefore, we must be extremely hesitant in brushing aside such error as harmless. (Citing cases.)
We need not decide whether error in this case was of constitutional magnitude requiring reversal, however, because we are convinced that the combined errors in permitting Gilbert to be impeached by his shoplifting conviction and in refusing to permit impeachment of a government witness by proof of a prior felony conviction were prejudicial.

. “In the federal jurisdiction the ‘incompetency’ is stated in terms of privilege, and the privilege is limited to that of a spouse charged in a criminal action to prevent his spouse from testifying against him.” 3 Jones on Evidence 700 (6th ed. 1972).

. United States v. Mackiewicz, 401 F.2d 219, 225-26 (2d Cir.), cert. denied, 393 U.S. 923, 89 S.Ct. 253, 21 L.Ed.2d 258 (1968).

. Peek v. United States, 321 F.2d 934, 943 (9th Cir. 1963), cert. denied, 376 U.S. 954, 84 S.Ct. 973, 11 L.Ed.2d 973 (1964); Olender v. United States, 210 F.2d 795, 800 (9th Cir. 1954), cert. denied, 352 U.S. 982, 77 S.Ct. 382, 1 L.Ed.2d 365 (1957).

. Judge Learned Hand, speaking for the court, said at 500:
The last point is the judge’s refusal to direct the jury not to use against Pugliese the declarations of his wife to the policeman. The fact that the couple was not indicted for conspiracy, was irrelevant in determining the competency against him of any thing she might say. American Fur Company v. United States, 2 Pet. (27 U.S.) 358, 365, 7 L.Ed. 450; Tuckerman v. United States, 6 Cir., 291 *1365 F. 958, 970; Gooch v. United States, 10 Cir., 82 F.2d 534, 536, 537. That depended upon whether what she said was a step in a venture to which both were parties. If it was, it was admissible in any prosecution or in any civil action; if it was not, it was as incompetent in a prosecution for conspiracy as anywhere else, although it appears impossible to disabuse prosecutors of the contrary belief. As we said in Van Riper v. United States, 2 Cir., 13 F.2d 961, 967: “When men enter into an agreement for an unlawful end, they become ad hoc agents for one another, and have made ‘a partnership in crime.’ What one does pursuant to their common purpose, all do, and, as declarations may be such acts, they are competent against all.” See also United States v. Goodman, 2 Cir., 129 F.2d 1009, 1013.
Cf. United States v. Van Drunen, 501 F.2d 1393 (7th Cir.), cert. denied, 419 U.S. 1091, 95 S.Ct. 684, 42 L.Ed.2d 684 (1974); United States v. Mackiewicz, 401 F.2d 219 (2d Cir.), cert. denied, 393 U.S. 923, 89 S.Ct. 253, 21 L.Ed.2d 258 (1968); United States v. Doughty, 460 F.2d 1360 (7th Cir. 1972); United States v. Kahn, 471 F.2d 191 (7th Cir. 1972) (involving the confidential communication privilege).

. Hawkins v. United States, 358 U.S. 74, 79, 79 S.Ct. 136, 3 L.Ed.2d 125 (1958).

. Hawkins v. United States, 358 U.S. 74, 81, 79 S.Ct. 136, 3 L.Ed.2d 125 (1958).

. A substantial part of the conversation between Bobbi Mitchell and Shelly and Debbie was a necessary indoctrination.

. Hawkins v. United States, 358 U.S. 74, 75, 79 S.Ct. 136, 137, 3 L.Ed.2d 125 (1958).

. Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942). See also United States v. Perry, 550 F.2d 524 (9th Cir. 1977).

. United States v. Silla, 555 F.2d 703 (9th Cir. 1977); United States v. Heck, 499 F.2d 778 (9th Cir. 1974).

. Accord, United States v. Ledee, 549 F.2d 990 (5th Cir. 1977); United States v. Cosby, 529 F.2d 143, 147-49 (8th Cir.), cert. denied, 426 U.S. 935, 96 S.Ct. 2647, 49 L.Ed.2d 386 (1976); United States v. Crawford, 444 F.2d 1404 (10th Cir.), cert. denied, 404 U.S. 855, 92 S.Ct. 98, 30 L.Ed.2d 95 (1971); United States v. Gillette, 383 F.2d 843 (2d Cir. 1967).

. Count 4 charged only Mitchell.

. Had there been a conviction on Counts 2 and 3 and sentences imposed no greater than and running concurrently with those given in Count 1, the Court of Appeals, under the concurrent sentence rule, would not have been required to review the judgment. Barnes v. *1367 United States, 412 U.S. 837, 93 S.Ct. 2357, 37 L.Ed.2d 380 (1973); Benton v. Maryland, 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969); Hirabayashi v. United States, 320 U.S. 81, 63 S.Ct. 1375, 87 L.Ed. 1774 (1943); United States v. Fishbein, 446 F.2d 1201 (9th Cir. 1971); United States v. Washabaugh, 442 F.2d 1127 (9th Cir. 1971); Lambert Inc. v. Starbrand Sales Corp., 422 F.2d 621 (7th Cir. 1970).

. Mitchell’s requested instruction was as follows:
It is a defense to a crime that the Government engaged in overreaching participation in the commission of the crimes charged in counts II, III and VI.
As you will recall, the evidence regarding the Government’s participation in this case, focused to a great extent on the activities of Shelly and Debbie (surnames omitted) who testified in this case. In consideration of this defense, you, as the sole judges of the facts, must determine what role these women played in the case based upon a careful and thorough review of all the evidence. You must determine whether the facts as you find them, amount to an intolerable degree of overreaching governmental participation.
If you find that the overreaching participation by the government agents or informers in the activities as you have heard them testified to here were so fundamentally unfair to be offensive to the basic standards of decency, and shocking to the universal sense of justice, then you may acquit each defendant to whom this defense applies.- — -Record on Appeal 129.
Price’s requested instruction was similar.