UNITED STATES of America, Appellee,

v.

Sada VARGAS, a/k/a Zaida Hernandez, Appellant.

No. 257, Docket 79–1198.

United States Court of Appeals, Second Circuit.

Submitted Sept. 28, 1979.

Decided Feb. 11, 1980.

Gilbert Epstein, New York City, for appellant.

Dwight L. Greene, Howard W. Goldstein, Asst. U. S. Attys., Southern District of New York, New York City (Robert B. Fiske, Jr., U. S. Atty., Southern District of New York, New York City, of counsel), for appellee.

Before MOORE, OAKES and NEWMAN, Circuit Judges.

OAKES, Circuit Judge:

This appeal from conviction on substantive and conspiracy charges raises a question under *Pinkerton v. United States*, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946), about some of the trial court's instructions possibly relating to the substantive count. The case also calls into question applicability of the "concurrent sentence" doctrine, since appellant was sentenced by the United States District Court for the Southern District Of New York, John M. Cannella, Judge, to concurrent terms of three years' imprisonment on Counts One (conspiracy to violate federal narcotics laws, 21 U.S.C. § 846) and Two (distributing and possessing with intent to distribute 44.93 grams of

heroin on July 20, 1978, 21 U.S.C. §§ 812, 841(a)(1), (b); 18 U.S.C. § 2), to be followed by a three-year period of special parole. We decline to apply the "concurrent sentence" doctrine; we affirm the conviction on both counts.

FACTS

The Government's proof was that on July 20, 1978, Louis Diaz, an undercover agent of the Drug Enforcement Administration (DEA) posing as a narcotics purchaser, and an informant named "Tonio" went to 600 East 139th Street in the Bronx, where Tonio introduced Diaz to appellant's codefendant Rafel Rivera, also known as "El Viejo." El Viejo then introduced Diaz and Tonio to a second codefendant, Juan Rivera, also known as "Junior." These meetings were all in reference to a package of heroin discussed over the telephone by Tonio and El Viejo the day before. Junior, Diaz, and Tonio entered an apartment on the first floor of the 600 East 139th Street building, where Junior made a telephone call during which he mentioned that the persons interested in the deal were with him and ready to spend about $1,400 per ounce. Following the phone call, Junior told Diaz and Tonio that the deal was "okay" at that price, and the three men returned to the front of the building.

About ten minutes later, appellant Vargas and her teenage daughter drove up in a brown car. Appellant met first with El Viejo, the two subsequently were joined by Junior, and finally appellant, her daughter, and El Viejo entered the building while Junior returned to tell Diaz and Tonio that the heroin would be there within an hour. Appellant, El Viejo, and appellant's daughter left the building ten minutes later and drove off in the brown car. They returned about forty-five minutes later, whereupon appellant and El Viejo met with Junior out of the presence of Diaz and Tonio, after which appellant and Junior entered the building. A short time later Junior returned with an aluminum foil package in his hand and directed Diaz and Tonio to a small basement room equipped with a workbench and narcotics paraphernalia. Junior

opened the package containing brown powdery heroin, weighed the heroin, and computed a new price because of a small quantity shortfall. Junior used a friend of his to test the heroin by "shooting up," and the friend reported that the heroin had given him a nice "rush." Thereafter, Diaz paid Junior for the two ounces involved, and Diaz and Tonio exited. This transaction was alleged to be one of ten overt acts referred to in the conspiracy count; it also provided the basis for the substantive count.

Other overt acts included a transaction arranged on August 14 by telephone between Diaz and Junior, to be consummated on August 16, 1978 at the same Bronx address. Diaz arrived at 4:00 p. m. on schedule, and Junior advised him that the heroin was not yet there. Shortly thereafter, appellant left the building and drove off in the same brown car, accompanied by a man named "Cabeza" (which means "head" in English). A three-hour wait ensued, during which Junior made various telephone calls and explained the delay by reporting that appellant's connection was out "taking book." Appellant returned about 7:00 p. m. and shook her head to Junior, who then informed Diaz that the deal was off. There was another exchange of gestures between Diaz and Vargas, Diaz questioning her and receiving confirmation that the deal was off, evidently by a shake of the head.

On September 18, 1978, Diaz again called Junior, and Junior told him he had both white and brown heroin. During the telephone conversation, Diaz heard Junior ask someone named "Sada" what an ounce of white heroin would cost, and heard a reply from a female voice of "thirty-two hundred dollars." The transaction was arranged for the next day. Upon Diaz's arrival at the Bronx address, Junior informed him that the two ounces of brown heroin would be arriving momentarily, and that appellant was going to obtain a sample of white. Several minutes later, appellant exited the building, met with Diaz and Junior, told them she would get the "stuff," and drove off in the same brown car, this time accom-

panied by two teenage boys. Followed by DEA agents, she drove through the Bronx to a McDonald's restaurant in Manhattan near 103rd Street, double-parked, bought some food, and then waited in the car for about fifteen minutes until a man and woman approached the car for a brief conversation. Appellant then returned to East 139th Street, talked with El Viejo at the street corner, and then proceeded to meet Diaz at the building itself. She told him she was unable to obtain the sample because her connection was unavailable. But she also said she would try to meet the connection later that evening, and Diaz replied that he would try to return but said that in any event she should hold the heroin for him. He did not return, but a week later telephoned Junior, whose phone was answered by El Viejo. Diaz asked him if appellant had the white heroin sample and El Viejo replied that he did not know but would call appellant to the telephone. She came to the telephone and told Diaz that she had not received the heroin, but said that Diaz should speak with her "husband," William Vargas Rivera, also known as "Chapo," another codefendant. Chapo stated there was no need to obtain a sample because he had eight ounces of good heroin available at $3,200 an ounce. Diaz informed Chapo that he already knew the price, but wanted an ounce to judge the quality of the merchandise. Diaz was to call back the next day before coming to the Bronx to pick up the goods.

When Diaz did call, Junior answered, and Diaz explained that he had not been trying to avoid dealing with him. Junior reassured him that it made no difference since Chapo, Sada (appellant), El Viejo, and he all worked together. Junior told Diaz that he had the white heroin and that Diaz could purchase it that evening, but Diaz said he would come up instead the next day, September 29, 1978. When he did arrive at 600 East 139th Street, Junior met him and stated that, although the heroin was available, he would have to wait for appellant and Chapo to return. They did so, and Chapo then came back downstairs with an ounce of white heroin. In the basement room, he divided the drugs into five equal parts, "cut" them with some lactose, and gave some to Junior to test, who injected some of the heroin into his veins and reported it gave him a "nice flush." Diaz took the heroin from Junior, brought $3,200 from his car, and paid Junior to consummate the purchase of heroin.

Appellant did testify in her own behalf, admitting that she had been convicted of weapon possession and of heroin usage, but denying participation in the drug selling operation, in fact denying that she knew how to drive or conversed with Diaz beyond "hello." Although she admitted going to a McDonald's restaurant in September of 1978, she disputed Diaz's testimony and that of two surveillance agents that she met anybody there.

THE INSTRUCTION IN QUESTION

Appellant claims that the district judge erred, in his response to a jury note containing four questions and requests, by delivering a *Pinkerton* charge not warranted by the parties' contentions or correct as a matter of law. The second of the jury's four questions and requests asked: "If one or more members of the conspiracy is guilty of a crime committed during the period set forth in the indictment, is each member of the conspiracy, though not present, physically equally guilty?" Replying to this question, the judge instructed the jury:

> If it is established beyond a reasonable doubt that a conspiracy existed and that the defendant was one of its members, then the acts and declarations of any member of such conspiracy in or out of the presence of the defendant, which is done in furtherance of the objects of the conspiracy and during its existence, may be considered as evidence against that defendant. When men join into an agreement for an unlawful purpose, they become agents for one another.

Appellant argues first that this instructed the jury that appellant could be convicted of the substantive crime under the rule of *Pinkerton v. United States, supra,* although this case was not tried under the

*Pinkerton* rule, and second that the Government never requested the district court to give a *Pinkerton* instruction. Her argument is that the court's instruction, erroneous in any event, could have misled the jury into returning a guilty verdict on the substantive count although it did not find her a member of the conspiracy charged on July 20, 1978. Appellant maintains that the jury was permitted to find appellant guilty of a substantive crime committed by one of her indicted coconspirators on the theory that the act was in furtherance of the conspiracy, without having to find that she was a member of the conspiracy at the time of the commission of the substantive crime.

■ She also contends that the erroneous charge influenced the jury's verdict on the conspiracy count itself, so tainting it as to require reversal of the conspiracy as well as the substantive conviction. *See United States v. Cantone*, 426 F.2d 902, 905 (2d Cir.), *cert. denied*, 400 U.S. 827, 91 S.Ct. 55, 27 L.Ed.2d 57 (1970). But unlike in *Cantone*, the evidence here was more than ample to establish both that appellant was a member of the conspiracy at the time of the July 20, 1978 heroin sale and that she participated in the sale. Therefore, the danger that a *Pinkerton* charge on the substantive count would lead the jury to convict her for conspiring with others, during a time period when the evidence was insufficient, did not exist. *See United States v. Sperling*, 506 F.2d 1323, 1343 n.29 (2d Cir. 1974), *cert. denied*, 420 U.S. 962, 95 S.Ct. 1351, 43 L.Ed.2d 439 (1975). Thus, the conviction on the conspiracy count must be affirmed.

THE "CONCURRENT SENTENCE" DOCTRINE

The Government suggests (Brief of Appellee at 15 n.*) that we might apply the "concurrent sentence" doctrine so as to affirm the substantive count and avoid addressing any other issue, referring us, *e. g.*, to *United States v. Vega*, 589 F.2d 1147, 1155 (2d Cir. 1978), and *United States v. Hanlon*, 548 F.2d 1096, 1099 (2d Cir. 1977), but candidly also citing as a *"But see" United States v. Ruffin*, 575 F.2d 346 (2d Cir. 1978), where a panel of this court noted that "utilization of the concurrent sentence doctrine is now the exception rather than the rule." *Id.* at 361. This apparent inconsistency between recent cases in this court has led us to reexamine our cases applying or not applying the doctrine, cases from the other circuits and the Supreme Court, and the underlying rationale of the doctrine to determine whether it should be applied here. We find that cases in this circuit are inconsistent, which is not surprising in view of the lack of logical consistency in the Supreme Court cases and the widely varying results in other circuits, and that the reasons for not applying the doctrine, at least in this instance, outweigh the supposed "judicial convenience" suggested as a reason for doing so.

■ The doctrine, it will be recalled, permits an appellate court, within its discretion, to affirm summarily a conviction for which an appellant's sentence runs concurrently with that for another, valid conviction.

A. *Second Circuit Law.* The cases in this circuit have followed several different patterns. One line of cases, typified by *United States v. Vega, supra*, and *United States v. Mejias*, 552 F.2d 435, 444–45 (2d Cir.), *cert. denied*, 434 U.S. 847, 98 S.Ct. 154, 54 L.Ed.2d 115 (1977), applies the doctrine without further comment, at least where "no claim of resulting collateral consequences has been made." *Id.* at 445. Similarly, a series of cases, including *United States v. Vasquez*, 468 F.2d 565 (2d Cir. 1972), *cert. denied*, 410 U.S. 945, 93 S.Ct. 1400, 35 L.Ed.2d 612 (1973), and *United States v. Gaines*, 460 F.2d 176 (2d Cir.), *cert. denied*, 409 U.S. 883, 93 S.Ct. 172, 34 L.Ed.2d 139 (1972), applies the doctrine to affirm the conviction after ascertaining that there could be no prejudicial "spillover" from the challenged conviction to the conviction upheld or unchallenged.

On the opposite side of the spectrum is *United States v. Febre*, 425 F.2d 107 (2d Cir.), *cert. denied*, 400 U.S. 849, 91 S.Ct. 40, 27 L.Ed.2d 87 (1970), where relying on *Benton v. Maryland*, 395 U.S. 784, 787–93, 89

S.Ct. 2056, 2058–62, 23 L.Ed.2d 707 (1969), discussed below, a panel determined "not to apply" the doctrine. 425 F.2d at 113.[1] *See also United States v. Delgado*, 459 F.2d 471, 472 n.1 (2d Cir. 1972) (conviction reviewed, no reason given, *Benton* cited). Also declining to apply the doctrine, for reasons other than those offered in *Febre*, have been *United States v. Wishart*, 582 F.2d 236, 242 n.8 (2d Cir.), *cert. denied*, 439 U.S. 987, 99 S.Ct. 582, 58 L.Ed.2d 660 (1978) (Government did not urge application of doctrine; " 'utilization of the concurrent sentence doctrine is now the exception rather than the rule' "); *United States v. Papadakis*, 510 F.2d 287, 299 (2d Cir.), *cert. denied*, 421 U.S. 950, 95 S.Ct. 1682, 44 L.Ed.2d 104 (1975) (conviction reviewed because of "*amour-propre* among some narcotics violators" in view of *Benton's* hypothetical possibilities); *United States v. Peltz*, 433 F.2d 48, 52–53 (2d Cir. 1970), *cert. denied*, 401 U.S. 955, 91 S.Ct. 974, 28 L.Ed.2d 238 (1971) (conviction reviewed because question involved was "sufficiently likely to recur," the court "not pretend[ing] to understand exactly where [*Benton*] leaves the 'concurrent sentence' doctrine").

A third line of cases reviews the challenged conviction without even mentioning the "concurrent sentence" doctrine. *United States v. Sperling, supra*, 506 F.2d at 1343; *McGee v. United States*, 462 F.2d 243, 245 (2d Cir. 1972).[2]

And a fourth line invokes the doctrine *after* the challenged conviction has been analyzed, either as an alternative holding, *e. g., United States v. Herrera*, 584 F.2d 1137, 1150 (2d Cir. 1978); *United States v. Hanlon, supra*, 548 F.2d at 1099; or despite finding the conviction itself improper, *United States v. DeNoia*, 451 F.2d 979, 981 (2d Cir. 1971) (unsupported by evidence).

B. *The Law of Other Circuits.* Upon examining the law in other circuits, we see that the

> Fourth and Seventh Circuits reject the doctrine outright while the Fifth, Eighth and Ninth Circuits employ it quite frequently. The stated difference between the circuits is that the former circuits assume that collateral consequences always result from a concurrent sentence while the latter three circuits rarely hold that such consequences exist. This stated difference means little in reality because the existence of such consequences is very difficult to predict or quantify. Consequently, although it is possible to detect the general trend in a circuit, it is difficult to explain why the circuits are split and to predict when a circuit will deviate from that trend.

Note, *The Concurrent Sentence Doctrine After Benton v. Maryland*, 7 U.C.L.A.–Alaska L.Rev. 282, 306 (1978) (footnotes omitted).

C. *The Supreme Court Cases.* But none of this is really surprising, because, as we have suggested, and as Judge Friendly noted in *United States v. Peltz, supra*, 433 F.2d at 52–53, the Supreme Court itself has not exactly provided crystal-clear guidance on the subject. Formerly, the Court regularly invoked the doctrine without explanation. *United States v. Romano*, 382 U.S. 136, 138, 86 S.Ct. 279, 280, 15 L.Ed.2d 210 (1965); *Claassen v. United States*, 142 U.S. 140, 146–47, 12 S.Ct. 169, 170–71, 35 L.Ed. 966 (1891). Then, in *Sibron v. New York*, 392 U.S. 40, 50–58, 88 S.Ct. 1889, 1896–1900, 20 L.Ed.2d 917 (1968), the Court seemed to knock at least some of the props out from under the doctrine when it held that an appeal from a conviction where the appellant had already completed serving his sentence nevertheless was not moot. Citing

---

1. The majority of the panel upheld the convictions on two of the four counts while Judge Hays, dissenting, would have presumed prejudicial "spillover." *United States v. Febre*, 425 F.2d 107, 114 (2d Cir.), *cert. denied*, 400 U.S. 849, 91 S.Ct. 40, 27 L.Ed.2d 87 (1970).

2. Of course, when an improper sentence on one of the counts is involved, the doctrine does not

come into play. *E. g., United States v. Rosenthal*, 454 F.2d 1252, 1255–56 (2d Cir.), *cert. denied*, 406 U.S. 931, 92 S.Ct. 1801, 32 L.Ed.2d 134 (1972) (lesser included offense, where two punishments not contemplated by Congress); *United States v. Marshall*, 427 F.2d 434 (2d Cir. 1970) (sentence imposed on conviction upheld is proper).

*Pollard v. United States*, 352 U.S. 354, 77 S.Ct. 481, 1 L.Ed.2d 393 (1957), for the proposition that it is an "obvious fact of life that most criminal convictions do in fact entail adverse collateral legal consequences," 392 U.S. at 55, 88 S.Ct. at 1899 (footnote omitted), the Court in *Sibron* noted some of those consequences: impeachment of character in a future trial, *id.* at 55–56, 88 S.Ct. at 1898–1899, influencing subsequent sentencing, *id.* at 56, 88 S.Ct. at 1899; or subjecting an alien to deportation or difficulty in obtaining American citizenship, *id.* at 54, 88 S.Ct. at 1898. It was of "no relevance" that Sibron was a multiple offender, since it is "impossible . . . to say at what point the number of convictions on a man's record renders his reputation irredeemable." *Id.* at 56, 88 S.Ct. at 1899 (footnote omitted). Even if it were, it would be "impossible for us to say that he had no interest in beginning the process of redemption with the particular case sought to be adjudicated."[3] *Id.* at 56, 88 S.Ct. at 1899.

These arguments seem to undermine any basis for the "concurrent sentence" doctrine, a fact *Benton v. Maryland, supra,* seems to acknowledge, 395 U.S. at 790–91, 89 S.Ct. at 2060–61, noting that "[o]ne can search through [previous Supreme Court] cases, and related ones, without finding any satisfactory explanation for the concurrent sentence doctrine," *id.* at 789, 89 S.Ct. at 2060. Yet, the Court ruled only that the doctrine presented no jurisdictional bar to reviewing the challenged conviction, and

added that, in certain circumstances (nowhere explained in the opinion), a federal appellate court "as a matter of discretion" might decide that it is unnecessary to consider all the allegations made by a particular party. *Id.* at 791, 89 S.Ct. at 2060. The Court added that the "concurrent sentence rule [sic] may have some continuing validity as a rule of judicial convenience." *Id.* Justice White, concurring, said that in a time of "increasingly congested judicial dockets," the "rule" was really one of "fairness to other litigants," *id.* at 798–99, 89 S.Ct. at 2064–2065, and that, while the fact of a prisoner's conviction could possibly be used against him in a recidivism prosecution or for impeachment purposes, "our experience gives us no indication that [the unreviewed counts] are frequently of such importance later that the concurrent sentence rule should not be applied." *Id.* at 799, 89 S.Ct. at 2065. Justice Harlan, with Justice Stewart joining, dissented on the basis that the doctrine "plays a significant role in conserving the time and energy of appellate courts," *id.* at 802, 89 S.Ct. at 2066 (footnote omitted), and that collateral consequences were either remote or "plainly insignificant," *id.* at 805, 89 S.Ct. at 2068. Obviously, the suggestions by some student commentators that the doctrine was for all practical purposes dead,[4] like the rumors pertaining to Mark Twain, were premature—*Benton* had expressly left the question open.

Then came *Barnes v. United States*, 412 U.S. 837, 93 S.Ct. 2357, 37 L.Ed.2d 380

---

3. The court continued: .

 We cannot foretell what opportunities might present themselves in the future for the removal of other convictions from an individual's record. The question of the validity of a criminal conviction can arise in many contexts, compare *Burgett v. Texas*, 389 U.S. 109 [88 S.Ct. 258, 19 L.Ed.2d 319] (1967), and the sooner the issue is fully litigated the better for all concerned. It is always preferable to litigate a matter when it is directly and principally in dispute, rather than in a proceeding where it is collateral to the central controversy. Moreover, litigation is better conducted when the dispute is fresh and additional facts may, if necessary, be taken without a substantial risk that witnesses will die or memories fade. And it is far better to eliminate the

 source of a potential legal disability than to require the citizen to suffer the possibly unjustified consequences of the disability itself for an indefinite period of time before he can secure adjudication of the State's right to impose it on the basis of some past action. *Sibron v. New York*, 392 U.S. 40, 56–57, 88 S.Ct. 1889, 1899, 20 L.Ed.2d 917 (1968).

4. Note, *The Federal Concurrent Sentence Doctrine*, 70 Colum.L.Rev. 1099 (1970); Comment, *Benton v. Maryland: A Further Extension of the Rights of the Individual in Criminal Proceedings*, 18 Kan.L.Rev. 309 (1970); Note, *The Collateral Consequences Exception to the Concurrent Sentence Doctrine*, 44 Temple L.Q. 385 (1971).

(1973), where the Court itself "as a discretionary matter" declined to review four of six counts on which concurrent sentences had been received, *id.* at 848, 93 S.Ct. at 2364 n.16, with no statement of reasons given. *Barnes* was cited with evident approval, but was not utilized, in *Andresen v. Maryland*, 427 U.S. 463, 469 n.4, 96 S.Ct. 2737, 2743, 49 L.Ed.2d 627 (1976) (affirmance on untainted counts "does not, of course, affect our jurisdiction but it would permit us to apply the discretionary concurrent-sentence doctrine . . . and thereby decline to consider petitioner's constitutional claims").

Thus, the doctrine is alive and, if not well, available at least "as a matter of discretion," either for the convenience of the appellate court, *Benton v. Maryland, supra*, 395 U.S. at 791, 89 S.Ct. at 2060, or as a matter of fairness to other litigants, *id.* at 799, 89 S.Ct. at 2065 (White, J., concurring), or in general to conserve overworked courts' time and energy, as part of an omnipresent cry for judicial efficiency and economy.

 On this basis the inquiry in any given case might ask what are the collateral consequences of affirming the conviction on the basis of the doctrine, and whether they are of sufficient immediacy and impact to warrant its inapplicability. Such a strategy would entail an examination as to whether any of at least five factors might be present:

1. What is the effect on possible parole? *United States v. Holder*, 560 F.2d 953 (8th Cir. 1977), points out that the Department of Justice notes to the published parole guidelines say, " 'If an offense behavior involved multiple separate offenses, the sev-

erity level may be increased.' " [5] *Id.* at 956 (footnote omitted). *Holder* also points out that severity ratings affect the time of parole, *see* 28 C.F.R. § 2.20, at 84–88 (1979), as does the "salient factor rating," a measure of the offender's character or parole prognosis based largely on his prior criminal record, *id.* at 89–90. We add that conspiracy is regarded for guideline purposes as "one step below" the unconsummated offense, but equivalent to the underlying offense if the offense has been consummated. *Id.* at 89. Under its present practice, the U.S. Parole Commission rates offense severity according to its determination of the "actual offense behavior that occurred," and does not limit its consideration to behavior resulting in conviction. *See* Guideline Application Manual 4.08 (1979), *reprinted in* Appendix 4, U.S. Parole Commission Procedure Manual (1979); *see also Billiteri v. Board of Parole*, 541 F.2d 938, 944 (2d Cir. 1976). Thus, even if a conviction on a count with a concurrent sentence is reviewed and reversed, the Commission asserts the right to rely on the underlying behavior that occurred. However, the Commission requires disputed occurrences to be established by a preponderance of the evidence. 28 C.F.R. § 2.19(c) (1979), and an unreviewed conviction might well be considered more probative of the underlying facts than one that has been set aside.[6] Thus, so far as we can tell, appellant's parole would be affected under the existing regime of Department of Justice notes by whether her conviction on the substantive count stands.[7]

2. Would a "recidivist" statute apply to the conviction even if it were unreviewed? Some states "consider all prior felony convictions . . . under habitual criminal

---

**5.** This still holds true. *See* 28 C.F.R. § 2.20, at 89 (1979).

**6.** The Commission does not rely, for purposes of offense severity rating, on charges resulting in acquittal at trial, unless evidence not introduced there provides a "clear indication of guilt." 28 C.F.R. § 2.19(c) (1979). For purposes of counting prior convictions to determine a salient factor score, however, the Commission does rely on convictions that have been set aside, unless the conviction was set aside

"on grounds of innocence," or reversed or vacated on the ground that an indigent defendant was deprived of his right to counsel. Manual, *supra*, at 4.21.

**7.** *United States v. Holder*, 560 F.2d 953 (8th Cir. 1977), holds that the parole guidelines "necessitate a reassessment of [the concurrent sentence] doctrine." *Id.* at 956 (footnote omitted).

statutes, even if the convictions actually constituted only separate counts in a single indictment tried on the same day." *Benton v. Maryland, supra*, 395 U.S. at 790, 89 S.Ct. at 2060 (footnote omitted). In most states, however, all convictions handed down at the same time count as a single offense. *See* Annot., 24 A.L.R.2d 1247, 1262–67 (1952). Appellant's prior record apparently does not involve numerous felonies (she was previously convicted of "possessing a weapon and of using heroin," Brief of Appellee at 8). Thus, an unreviewed conviction here might operate to her detriment under those state statutes that would treat the conspiracy and substantive offenses separately.

3. Could the unreviewed conviction be used to impeach appellant's character at a future trial or be introduced as a prior similar act? While under *Benton* impeachment is a factor to be considered, it probably would have little effect here, except perhaps in a future drug-related case in which she was involved. On the other hand, the unreviewed conviction could well be admissible in a given case as a similar act, *i. e.*, to show intent, plan, or knowledge. *See generally* Fed.R.Evid. 404(b).

4. Could the unreviewed conviction affect a possible future pardon? It may be difficult to imagine pardon proceedings in cases of heroin offenses, but conceivably a differentiation could be made between a conviction for one conspiracy accompanied by a substantive conviction as opposed to an unaccompanied conspiracy conviction. This is probably remote in the instant case, however.

5. Could stigma result? Stigma is not only a factor mentioned by the unanimous panel in *United States v. Hines*, 256 F.2d 561, 563 (2d Cir. 1958), but also a key element underlying the criminal law, at least according to some commentators. A corollary of the stigma argument is the elemental and personal desire of any individual simply not to be saddled with unfair judgments, even if there are no practical consequences. These factors may or may not be important here: one wonders whether the crime of conspiracy alone carries more or less stigma than convictions of conspiracy and possession.

Overall, a review of the above factors accomplishes two things. First, it leads us to review appellant's substantive offense conviction on the merits. This is true because, to prevent invocation of the concurrent sentence doctrine, which is now the "exception rather than the rule," *United States v. Ruffin, supra*, the defendant should not have to make an affirmative showing of collateral consequences. Rather, to invoke the doctrine, the Government should have the burden of persuading the appellate court that the risk of collateral consequence is too slight to justify review. Application of the above five factors to the instant case indicates that this burden has not been satisfied: the risk of collateral consequences in this, a case of a substantive count accompanying a conspiracy count, is sufficient to justify review of the former.

Second, our specific analysis demonstrates how much uncertainty and judicial time and effort are involved in any review of the risk of collateral consequences, *see* Note, *The Concurrent Sentence Doctrine After Benton v. Maryland*, 7 U.C.L.A.–Alaska L.Rev. 282, 301–03 (1978), judicial time and effort that reduce any "convenience" flowing from the doctrine.

Three other points come to mind. First, the supposed "convenience" is further reduced when the record has to be examined, as we had to here, to determine whether there is taint or spillover from the challenged conviction to the unchallenged one. Second, this "convenience" really consists of not having to think or write about the point(s) of law raised concerning the challenged count by the appellant. Third, it would be logically just as "convenient" to reverse the conviction on the unreviewed conviction as to affirm it. *Id.* at 283. We therefore turn to the conviction of appellant on the substantive count.

### THE SUBSTANTIVE CONVICTION

The district court below gave the challenged instruction in response to the second of the jury's questions or requests. The jury's question did not specify whether or

not it was asked in reference to the conspiracy count (in which event the instruction would have been generally proper under Fed.R.Evid. 801(d)(2)(E), *see, e. g., United States v. Ziegler*, 583 F.2d 77, 79–80 (2d Cir. 1978), even though it does mention "acts" as well as "declarations") or in reference to the substantive count, in which case it may have caused some confusion. We must look at the charge in context to determine which interpretation is the more likely. The first question asked by the jury was plainly addressed to the conspiracy count.[8] The district judge then appeared to treat the second question as also addressed to the conspiracy count, because he prefaced the rereading of that portion of his conspiracy charge herein challenged, by saying: "The question of presence is answered by this section of the conspiracy charge." The instruction made no mention of the substantive count nor of the crime it charged.

Moreover, the remainder of the supplemental charge, in reply to the third jury request asking for a "read back" of the jury charge, simply reiterated the elements of the charge as to each count. In the course of the supplemental charge as to the conspiracy count, the judge restated his answer to the second question, keeping the substantive count quite separate. In fact, he added a sentence just after the almost verbatim restatement showing clearly that he was thinking in terms of the conspiracy and the relevant rules of evidence: "However, statements of any conspirators which are not in furtherance of the conspiracy or made before or after the termination may be considered as evidence only as against the person making it." And, in the portion of the supplemental charge pertaining to the substantive count, he said plainly that

the Government had to prove beyond a reasonable doubt that the defendant, on July 20, 1978, willfully and knowingly distributed or possessed a controlled substance —otherwise, the jury must acquit. The judge did not make the slightest reference to a possible alternative or *Pinkerton* theory for conviction, where appellant might be held liable for the acts of others, on that substantive count. Significantly, no objection was made to the judge's response to the jury's third request, even though it repeated almost verbatim the challenged instruction given in answer to the second question.

■ But even assuming that the jury, or some of the jurors, were confused and thought that the challenged instruction referred to the substantive count—an assumption that in view of the foregoing seems highly unlikely to us—the gravamen of appellant's complaint here is that the instruction failed to include language that, in order to convict on the substantive count, there had to be proof that appellant was a member of the conspiracy on July 20, 1978, the date of the alleged substantive offense. Assuming that the "exception" granted to defense counsel was on this point,[9] any possible error was harmless, since the defendant below did not argue that appellant did not join the conspiracy until after July 20, 1978, but instead that she never joined it, a finding the jury rejected. The defendant may not now change gears on appeal to suggest that her membership if at all proved, did not occur until after July 20, 1978, an argument only designed to challenge the wording of the alleged *Pinkerton* charge. Furthermore, unlike the situation

---

**8.** The first question was: "Restate that part of our responsibility about the ten points. Must that one point be specific to the defendant." The "ten points" was a reference to the overt acts charged, as the judge quite properly reminded the jury.

**9.** This following colloquy occurred:

Mr. Epstein: Judge, whether it's *Pinkerton*, as I have suggested, or not, as your Honor maintains, my position is, in this case the only crime that was actually committed is, insofar

as this case is concerned, is July 20, 1978, the delivery of the 2 ounces of the brown heroin. And the question is whether or not my client delivered it, and having delivered it, she did it with knowledge.

The Court: I differ with your position on the law, and I am going to tell the jury just what I read to you out of La Buy, as far as that request is concerned, and that will be an exception to the defendant.
Joint Appendix at 246.

in *United States v. Cantone, supra,* 426 F.2d at 904–05 (evidence insufficient to prove conspiracy beyond a reasonable doubt), the evidence here on appellant's conspiracy conviction was sufficient to overcome any possible jury confusion in any event.

Judgment affirmed on both counts.

MOORE, Circuit Judge (concurring):

I concur in the majority's conclusion "Judgment affirmed on both counts". In reaching this result, I find it unnecessary to participate in so much of the opinion as is contained in the section entitled "THE 'CONCURRENT SENTENCE' DOCTRINE" and the five hypothetical situations posed therein.