**Ralph STEINER, Petitioner,**

v.

**COMMISSIONER OF CORRECTION, Respondent.**

No. 80 Civ. 1413.

United States District Court,
S. D. New York.

May 8, 1980.

Irving Anolik, New York City, for petitioner.

Patrick Henry, Dist. Atty. of Suffolk County, Riverhead, N. Y., for respondent; Vincent A. Malito, Chief, Appeals Bureau, Asst. Dist. Atty., Riverhead, N. Y., of counsel.

## OPINION

EDWARD WEINFELD, District Judge.

Petitioner, convicted upon a jury verdict in the County Court of Suffolk County, State of New York of attempted grand larceny in the second degree and illegal possession of vehicle identification number plates, each a class E felony, now serving concurrent indeterminate sentences on each count of one and one-half to three years, seeks his release upon a federal writ of habeas corpus.[1] He alleges that the judgment of conviction is void for violation of his federal constitutional rights in that: (1) he was denied due process of law based upon the doctrine recently promulgated by the Supreme Court that upon the evidence no rational factfinder could find guilt beyond a reasonable doubt;[2] (2) the statute under which he was convicted under Count 2 is constitutionally invalid; and (3) he was deprived of his right to a speedy trial as mandated by the Sixth Amendment of the Constitution. Upon a consideration of the trial record and the contentions of the petitioner and the state, the Court finds that these claims are without substance.

The indictment charged in the first count that in February 1976 the petitioner attempted to steal more than $1,500 from Aetna Insurance Company and, in the second count that he knowingly possessed five vehicle identification number plates which had been removed from vehicles to which they were attached originally by the

---

1. The judgment of conviction was affirmed without opinion by the Appellate Division 2d Dep't on December 24, 1979; leave to appeal to the Court of Appeals was denied on February 5, 1980. It is not disputed that petitioner has exhausted available state remedies as required by 28 U.S.C. § 2254(b).

2. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

manufacturers pursuant to the New York Vehicle and Traffic Law.[3]

The trial testimony developed that the petitioner was in the auto repair business and from time to time purchased automobiles that were almost total wrecks. The prosecution's theory under the indictment was that petitioner would remove a component part of a wrecked car to which the motor vehicle identification plate was attached (hereafter referred to as "VIN" plate or tag);[4] that because he was the legal owner of the wrecked car, the VIN number would be registered to him; that he would then transplant that component part, with the VIN still attached to it, into a "stolen" car; thus if the police ran a routine check on the stolen car via the VIN plate that car would come back registered to petitioner and the "stolen" car would have "disappeared"; that thereupon the owner would be informed so that he would report the car "stolen" to the police and to the insurance company and file a claim for the alleged loss to recover amounts payable under the policy.

In support of its theory and to sustain the indictment charges, the prosecution offered the testimony of John Licata, the husband of Genevieve, the registered owner of a Lincoln Mark IV, which was insured against theft by the Aetna Insurance Company ("Aetna"). Licata testified that he left the car with petitioner under a prearranged plan whereby the petitioner was to have it "disappear"; that the plan was executed and upon word from the petitioner[5] the Licatas reported the car stolen first to the police and then to their agent at the insurance brokerage company. Their agent testified that following advice from Mrs. Licata that the car had been stolen he telephoned Aetna to advise it and also that he filed a written claim for the loss with the company. An Aetna representative testified that such a claim for the loss had been filed on behalf of the assured but that it had not been honored.[6]

A detective attached to the auto theft squad testified that early in February 1976 he had observed the Lincoln car on petitioner's premises and a routine registration check indicated it was registered to Genevieve Licata; that about 11 days thereafter, he saw the same Lincoln but on this occasion it had a license plate which previously he had seen on a Corvette, also on petitioner's premises. A routine computer check of the Lincoln VIN disclosed it had been reported as stolen. Based upon these observations, the police obtained a warrant and searched an apartment occupied by petitioner. The police found the Lincoln car keys in a cup and also five VIN tags still attached to parts of cars (the subject of the second count). Testimony was also offered that the five VIN tags and the parts to which they were attached came from Chevrolet Corvettes.

The petitioner testified that he specialized in the repair of Chevrolet Corvettes; that in the course of his business he bought and sold automobiles; that the VIN tags found in his apartment belonged to Corvettes that he had purchased as near wrecks; that he had dismantled them for their parts which he then transplanted into other cars at his shop in the course of repair work; and that the five tags found in his

---

3. See N.Y. Vehicle and Traffic Law § 421(1) (McKinney's Supp.1980). *See generally id.* §§ 422, 429–31.

4. The VIN plate is not to be confused with the license number plate issued annually and required to be attached to a vehicle and exposed to public view. The VIN plate is a small rectangular metal tag on which the manufacturer stamps the vehicle identification number which is affixed permanently to the car. It is a series number assigned by the manufacturer of the car to the motor vehicle at the time of assembly and is affixed by a rosette rivet to a major

component part of the vehicle, usually to some part of the driver's window area. Each major American automobile manufacturer has its own unique type of numbering system.

5. Licata testified that petitioner informed him the car had been taken to Buffalo or Albany and that it was then in order for Licata to report the "theft" of the car.

6. After the filing of the claim the car was recovered by the police and returned to the Licatas.

apartment during the search, were there for "safekeeping."

With respect to the Lincoln car, petitioner's version was that Licata called on him early in February 1976 and offered to sell the car to him; that he made an offer to Licata who said he would get back to him; and that on the following day, Licata returned and left the car with petitioner to sell it.

Petitioner's contention, advanced before the Appellate Division for reversal of the conviction and here in support of the writ of habeas corpus, is that he had no direct dealings with Mrs. Licata, the registered owner of the car but only with her husband; that he did not himself report the car stolen either to the police or to the insurance company; that although the insurance company was notified of the theft no proof of loss requesting payment for the stolen car was ever filed with the insurance company. Based thereon petitioner contends that under New York law there was no "attempt" to steal property from the insurance company—that in the absence of such an essential ingredient of the crime charged, he was deprived of due process of law under the rational factfinder concept.[7]

■ Whether upon the facts there was an "attempt" to commit the crime charged involves an interpretation of the New York State statute and petitioner's claim may well be disposed of in that it presents no issue of federal constitutional dimension, since as stated by the Supreme Court, "[t]he state courts are the ultimate expositors of state law and we are bound by their construction except in extreme circumstances. . . ."[8] But even accepting that the instant case presents "extreme circumstances" so that the constitutional issue may properly be considered by this Court, analysis of the state act indicates that the state conformed to the due process requirements in that upon the trial it presented substantial evidence necessary to convince the jury beyond a reasonable doubt of the existence of every essential element of the crime of attempted grand larceny in the second degree.[9]

■ The New York statute provides: "A person is guilty of an attempt to commit a crime when, with intent to commit a crime, he engages in conduct which tends to effect the commission of such crime."[10] Under the act the attempt is "an act done with an intent to commit some other crime . . .. [F]irst [it must] be established that the defendant acted with a specific intent; that is, that he intended to commit a specific crime . . .. Secondly, it must be proven that the defendant acted to carry out his intent."[11]

The attempt law was enacted by the legislature in 1967 to eliminate the existing rule of the courts that "legal impossibility" was a good defense but "factual impossibility" was no defense to a charge of attempting to commit the crime. The New York State Court of Appeals in interpreting the newly enacted statute noted:

The approach of the draftsmen of the Model Penal Code was to eliminate the defense of impossibility in virtually all situations . . .. [T]he code suggested a fundamental change to shift the locus of analysis to the actor's mental frame of reference and away from undue dependence upon external considerations. The basic premise of the code provision is that what was in the actor's own mind should be the standard for determining his dangerousness to society and, hence, his liability for attempted criminal conduct.

In the belief that neither of the two branches of the traditional impossibility

7. See *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

8. *Mullaney v. Wilbur*, 421 U.S. 684, 691, 95 S.Ct. 1881, 1886, 44 L.Ed.2d 508 (1975).

9. *Jackson v. Virginia*, 443 U.S. 307, 316, 99 S.Ct. 2781, 2788, 61 L.Ed.2d 560 (1979); *In re*

*Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970).

10. N.Y.Penal Law § 110.00 (McKinney's 1975).

11. *People v. Bracey*, 41 N.Y.2d 296, 299–300, 392 N.Y.S.2d 412, 415, 360 N.E.2d 1094 (1977).

arguments detracts from the offender's moral culpability . . . the Legislature substantially carried the code's treatment of impossibility into the 1967 revision of the Penal Law . . . . Thus, a person is guilty of an attempt when, with intent to commit a crime, he engages in conduct which tends to effect the commission of such crime . . . . It is no defense that, under the attendant circumstances, the crime was factually or legally impossible of commission, "if such crime could have been committed had the attendant circumstances been as such person believed them to be."[12]

Accordingly, in that case, New York's highest state court held that the defendant may be held for attempted murder though the target of the attempt may have already been dead at the hand of another, when the defendant made his attempt.[13]

The evidence established that Mrs. Licata as the registered owner and her husband reported the car stolen to their insurance agent, and that he, in turn, by telephone and in writing notified the insurance company where a claim for the loss was recorded.

■ The fact that the Licatas did not sign the claim that their agent filed with the insurance company is without significance. The phoney "theft" of the car was part and parcel of the attempt to defraud the insurance company. Petitioner was an active participant in the scheme. His ac-

tions to simulate the loss constituted an essential element in the furtherance of the ultimate crime to obtain payment from and to defraud the insurance company. That a formal proof of loss signed by the assured was not submitted to the insurance company did not diminish or wipe out the conduct of the petitioner in simulating the theft of the car which was basic to the scheme to fraudulently obtain payment under the insurance policy. His conduct clearly reflects a specific intent to obtain the money from the insurance company and that he acted to carry out his intent. His role was complete when he notified Licata to report the car stolen; it was a substantial step in enabling the Licatas to file the claim for the "stolen" car with the purpose to consummate the ultimate crime of obtaining the insurance proceeds.[14] In sum, the evidence presented by the People and upon which the jury acted was substantial and such that a rational trier of the facts could find that the People had sustained its burden of establishing each essential element beyond a reasonable doubt.

Since the attempted grand larceny count is without constitutional taint and the sentence that was imposed upon the second count is concurrent with and for the same term of confinement as the first, it is unnecessary to consider petitioner's attack upon the constitutionality of the provisions of the Vehicle and Motor Law upon which the second count was based.[15]

12. *People v. Dlugash*, 41 N.Y.2d 725, 734–35, 395 N.Y.S.2d 419, 426, 363 N.E.2d 1155, 1161 (1977). *See also* N.Y.Penal Law § 110.10 (McKinney's 1975). Federal courts have also rejected the defenses of legal and factual impossibility to the crime of attempt. *See Fambo v. Smith*, 433 F.Supp. 590, 599 (S.D.N.Y.), *aff'd*, 565 F.2d 233 (2d Cir. 1977); *United States v. Heng Awkawk Roman*, 356 F.Supp. 434, 437–38 (S.D.N.Y.), *aff'd*, 484 F.2d 1271 (2d Cir. 1973), *cert. denied*, 415 U.S. 978, 94 S.Ct. 1565, 39 L.Ed.2d 874 (1974); *cf. United States v. Jackson*, 560 F.2d 112, 117–18 (2d Cir.), *cert. denied*, 434 U.S. 941, 98 S.Ct. 434, 54 L.Ed.2d 301 (1977).

13. *See also People v. Leichtweis*, 59 A.D.2d 383, 399 N.Y.S.2d 439 (2d Dep't 1977) (legal impossibility of burglary because defendant was present in the building with the consent of

the landlord no defense to the crime of attempted burglary).

14. *United States v. Jackson*, 560 F.2d 112, 116–17 (2d Cir.), *cert. denied*, 434 U.S. 941, 98 S.Ct. 434, 54 L.Ed.2d 301 (1977); *United States v. Stallworth*, 543 F.2d 1038, 1040 (2d Cir. 1976). To sustain a conviction for the crime of attempt under federal law, the prosecution must prove that the defendant acted with culpable purpose, and that he "engaged in conduct which constitutes a substantial step toward commission of the crime . . . ." *United States v. Stallworth, supra* at 1040.

15. This Circuit's recent decision in *United States v. Sada Vargas*, 615 F.2d 952 (2d Cir., 1980) is not to the contrary. In *Vargas* two members of a divided panel characterized use

Finally, the petitioner contends that he was denied the right to a speedy trial guaranteed by the Sixth Amendment of the Constitution. He was indicted on June 30, 1976 and was not tried until January 8, 1979. The petitioner and the state center their arguments about the New York State Speedy Trial Act which fixes a six-month deadline for the trial of felony charges subject to exceptions.[16] Each side taxes the other with delay and one seeks to come within and the other to avoid the various exceptions which extend the trial period. But that statute with its fixed time periods is not germane to the issue of the petitioner's claim of violation of his federal constitutional right to a speedy trial.[17] The determination as to whether this right has been observed cannot be made with exactitude. As stated by Mr. Justice Powell, "It is . . . impossible to determine with precision when the right has been denied. We cannot definitely say how long is too long in a system where justice is supposed to be sufficient but deliberate." [18]

In deciding whether a defendant has been deprived of a speedy trial, the Supreme Court specified four factors that are to be evaluated: (1) length of delay; (2) the reason for delay; (3) the defendant's assertion of his right; and (4) prejudice to the defendant.

Following petitioner's indictment, he was arraigned on July 13, 1976. Thereafter through to December 1976, a series of conferences was had followed by adjournments, mostly at petitioner's request, and on one occasion by consent of both the prosecutor and the petitioner. On October 29, 1976 the petitioner failed to appear; his bail was forfeited and a bench warrant was issued which was executed on December 17, 1976. The case was then set down for a conference on January 14, 1977 at which time defense counsel appeared and conferred with an assistant district attorney. The petitioner did not appear and his attorney had no explanation for his absence. Apparently his counsel and the assistant district attorney conferred with a view toward a disposition but this effort failed

of the "Concurrent Sentence Doctrine"—which permits an appellate court summarily to affirm a conviction the sentence for which runs concurrently with that of another, valid conviction—as "the exception, rather than the rule." *Id.* at 957. The Court recognized, however, that application of that doctrine remains discretionary even on direct appeals.

In the instant petition for habeas corpus relief, there are strong reasons to invoke the doctrine. Not to do so would require the Court to assess the constitutional validity of a state statute, even though a result favorable to the petitioner could not affect the length of his incarceration. The rule of *Vargas*, which is itself discretionary, is not applicable to the facts of this case.

**16.** N.Y.Crim.Proc.Law § 30.30 (McKinney's Supp.1980).

**17.** In *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972) the Court clearly distinguished between the Sixth Amendment's right to a speedy trial, which is constitutionally compelled; and other statutory rights, which are not:

We do not establish procedural rules for the States, except when mandated by the Constitution. We find no constitutional basis for holding that the speedy trial right can be quantified into a specified number of days or months. The States, of course, are free to prescribe a reasonable period consistent with

constitutional standards, but our approach must be less precise.
*Id.* at 523, 92 S.Ct. at 2188.
Those statutes and rules of procedure established by state legislatures, the Congress, and the courts which impose quantifiable deadlines for the prosecution of criminal matters create rights wholly independent from and in addition to the constitutional requirements. *See United States v. Carini*, 562 F.2d 144, 148 (2d Cir. 1977); *United States v. Furey*, 514 F.2d 1098, 1104 (2d Cir. 1975); *United States v. Roberts*, 293 F.Supp. 195, 198 (S.D.N.Y.1968); *Ad Hoc Committee on Judicial Admin. v. Commonwealth of Mass.*, 358 F.Supp. 953, 958 (D.Mass.), *aff'd*, 488 F.2d 1241 (1st Cir. 1973), *cert. denied*, 416 U.S. 986, 94 S.Ct. 2389, 40 L.Ed.2d 763 (1974). A state criminal defendant seeking relief under 28 U.S.C. § 2254 is limited to asserting "the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." *Id.* 2254(a). Thus, he may not rely upon any periods of delay specified in a state statute or rule, and may not raise any alleged violations of the state speedy trial standard in his federal petition.

**18.** *Barker v. Wingo*, 407 U.S. 514, 521, 92 S.Ct. 2182, 2187, 33 L.Ed.2d 101 (1972) (footnote omitted).

**210**

whereupon the assistant district attorney announced the prosecution's readiness to proceed to trial and the case was placed on the ready reserve calendar, subject to 24 hour call and adjourned to February 28, 1977. Thereafter to March 28, 1978 the case was called approximately on a monthly basis, and each time was marked ready. It was put over from time to time due to jail and other cases that had priority and because of calendar congestion. Within this period petitioner made a motion to dismiss under the State Speedy Trial Act returnable February 21, 1978 which was denied.[19]

In March 1978 the case was assigned to another judge who calendared it for March 20, 1978 and again the course of the case to June 28, 1978 was adjournment after adjournment, all "on consent." On the latter date the case was adjourned to September 11th at petitioner's request. From September 11 to September 25, 1978 the case was marked "ready and passed" on a daily basis. On September 25, 1978 petitioner requested and was granted an adjournment to October 10, 1978 on which day it was again marked ready and passed until October 18, 1978. From the latter date to various times up to January 8, 1979 the case was adjourned either at petitioner's request or on the consent of both parties. Finally, the trial commenced on January 8, 1979.

■ It is evident that the bulk of the repeated adjournments were either at the request of petitioner or with his consent and delay was also occasioned by his nonappearance on one occasion resulting in the issuance of a bench warrant. To be sure an accused's acquiescence in postponements or delays does not relieve the prosecution of its duty to move a case to trial expeditiously.[20] Nonetheless, the consent of the petitioner is a factor to be considered. Finally and most importantly, petitioner has not made the slightest showing of prejudice by reason of the delay—all witnesses who had relevant testimony were available and in fact did testify at the trial.[21]

Under all the circumstances the Court finds that petitioner's right to a speedy trial was not violated.

The petition for writ of habeas corpus is dismissed.

So ordered.

---

19. The memorandum decision of the Court noted that defendant did not allege that the People were delinquent in prosecuting the case. It is clear that the delay was attributable to cases which had precedence, such as those where defendants had not succeeded in posting bail.

20. Cf. Barker v. Wingo, 407 U.S. 514, 527, 92 S.Ct. 2182, 2190, 33 L.Ed.2d 101 (1972); U.S. v. Dillon, 183 F.Supp. 581 (S.D.N.Y.1961).

21. Petitioner upon his state appeal conceded "he did not demonstrate actual prejudice." Appellant's Brief, p. 13.