UNITED STATES of America, Plaintiff-Appellee,

v.

Sam Ford FISHBEIN and Leonard M. Yordon, Defendants-Appellants.

No. 23732.

United States Court of Appeals, Ninth Circuit.

July 28, 1971.

Rehearing Denied Sept. 23, 1971.

John W. Rood (argued), of Cavness, DeRose, Senner & Foster, Phoenix, Ariz., Luke McKissack (argued), Hollywood, Cal., Hochman, Salkin & DeRoy, Los Angeles, Cal., for defendants-appellants.

Richard C. Gormley, Asst. U. S. Atty. (argued), Edward E. Davis, U. S. Atty., Phoenix, Ariz., for plaintiff-appellee.

Before ELY and CARTER, Circuit Judges, and SMITH *, District Judge.

RUSSELL E. SMITH, District Judge.

AS TO FISHBEIN

Sam Ford Fishbein, convicted on Count 1 (Conspiracy), 18 U.S.C. § 371, Counts 2 to 8, and 10 to 15 (Fraud in the Sale of Securities), 15 U.S.C. § 77q(a) and Count 21 (Use of Mails to Defraud), 18 U.S.C. § 1341, of a 22-count indictment, appeals.

In June, 1961, a group consisting of Fishbein and four others acquired interests in six motels, two of which were located in Phoenix, and one each in the cities of Tucson, Houston, Tulsa, and San Diego. The purchase price was $4,000,000.00, of which $35,000.00 was paid down and the balance secured by mortgages on the purchased property. This group then organized the Hiway-House Hotels, Inc. (hereafter Hiway-House) and transferred the motels to it in exchange for 150,000 shares of common stock, par value $1.00 per share. The corporation then offered to the public 225,000 shares of common stock at a price of $4.80 per share. HiwayHouse itself employed a group of salesmen and conducted the promotion. ·

HiwayHouse did not prosper. From the beginning it operated with substantial losses. Within the period between the date of its incorporation and November, 1963, the retained earning deficit

---

* The Honorable Russell E. Smith, Chief Judge of the United States District Court for the District of Montana, sitting by designation.

was $1,148,156.31. In November, 1962, HiwayHouse lost its Houston property. As of September, 1962, an audit showed that it had sustained losses in the Tucson operation of $110,374.22 in the period between August 1, 1961, and December 31, 1961. At that time it had been recommended to the corporation that it abandon the Tucson HiwayHouse lease, which it was able to do under somewhat peculiar terms of the lease. In March, 1963, it did abandon the Tucson properties. Early in 1964 it lost all of the properties and its stock became worthless.

The evidence warranted a finding by the jury that almost from the beginning and continuously until November, 1963, the officers of HiwayHouse diverted funds to themselves, used corporate funds to supply personal needs, diverted HiwayHouse funds to corporations, the stock in which was owned by HiwayHouse officers, including Fishbein, and also pledged the credit of the corporation in behalf of these same officer-owned corporations.

For use in the sale of stock of HiwayHouse a prospectus was issued on October 3, 1961, another one on November 28, 1961, and still another on October 11, 1962. All of the prospectuses issued carried an August 1, 1961, balance sheet. All of them in the paragraph entitled "Transactions With Management" contained nothing more than a description of the formal stock arrangement existing between the company and its promoters and revealed nothing of the cash flow between the corporation and its officers, and nothing with respect to the relationship between HiwayHouse and corporations which were owned and controlled by the officers of HiwayHouse. All of them described the initial six properties, although it is fairly inferable from the record that prior to the issuance of the prospectus in October, 1962, the officers knew that the Tucson property would be abandoned, and also knew that the Houston lease was in default. In any event, after March, 1963, the date upon which the Tucson property

was finally abandoned, the prospectus was false and its use misleading.

Fishbein became an executive vice president of HiwayHouse and its chief executive officer in November, 1961, and on January 15, 1962, he was made president. The evidence warrants a finding that he knew of some, if not all, of the dealings between the officers and the corporation, that he knew of the deteriorating financial condition of the corporation, and that he knew that the properties at Tucson and Houston had been lost. He knew that the prospectus was being used by the salesmen of HiwayHouse in the sale of its stock.

■ It is urged that there was insufficient evidence to prove a conspiracy with respect to Fishbein. The problem is not without difficulty, but the necessary agreement can be inferred from the proved facts, and that is sufficient. United States v. Bates, 429 F.2d 557 (9th Cir. 1970); United States v. Jones, 425 F.2d 1048 (9th Cir. 1970). Fishbein and the others did agree to the organization of HiwayHouse and the public offering of its stock. They agreed upon the plan of selling the stock by the HiwayHouse sales force. They participated in and knew of the diversion of HiwayHouse funds. It may be inferred that the various defendants did not want their dealings with the corporate funds and credit made public and tacitly agreed upon the content and use of the prospectuses which failed to adequately reflect those dealings. It may also be inferred that they agreed to use the August, 1961, balance sheet in the prospectuses which bypassed any reflection of the financial transactions between the officers and the corporation and concealed the corporate losses which had occurred in the interim. From all of this we believe that a jury might properly conclude that there was a conspiracy to commit a fraud in the sale of the corporate securities and that this conspiracy included the use of the mails.

■ It is next urged that, there having been a conviction on the conspiracy

charge, the Government should be precluded from prosecuting the substantive offenses. This rule has been advocated [1] but it is not the law except under circumstances which are not pertinent in view of our disposition of the case as to Fishbein. Pinkerton v. United States, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946); Callanan v. United States, 364 U.S. 587, 81 S.Ct. 321, 5 L.Ed.2d 312 (1961).

■ Fishbein was convicted on Count 3 of the indictment charging fraud in the sale of securities to one Peterlin, in violation of 15 U.S.C. § 77q. The second prospectus was delivered by mail to Peterlin. At the time of his purchases in June and July, 1962, Prospectus No. 2 was at best misleading. Although it indicated that the officers were serving without compensation, substantial sums had been paid to them without any corporate authority. Substantial obligations had been incurred which were not shown. False and misleading statements were made to Peterlin by both Wagner (the Sales Manager) and Fishbein. As a result of all of this Peterlin purchased 1300 shares of stock for $6,140.00. In our opinion the evidence viewed in the light most favorable to the Government was sufficient to warrant the conviction on Count 3.

■ We direct that the judgments of conviction be vacated as to Counts 2, 4, 5, 6, 7, 8, 11, 12, 13, 14, 15, and 21, said judgments to be reinstated if Fishbein shall violate the terms of his probation as to Count 3. We do this without passing upon the multiple problems of fact and law which we would be required to examine were we to dispose of these counts on the merits. Our reasons are these:

The judgment in this case fined the defendant $5,000.00 on Count 1 and then provided "that the imposition of sentence as to imprisonment only is suspended and defendant placed on probation for a period of two (2) years" on the remaining counts. The effect of what we do is to maintain the fine on Count 1 and the judgment of conviction as to Count 3. We do not vacate the jury verdict but in effect confirm the Court's suspension of the imposition of sentence on the counts as to which judgment is vacated. See United States v. Hooper, 139 U.S.App.D.C. 171, 432 F.2d 604 (1970). If Fishbein should violate the terms of his probation, the District Court may reinstate the judgment as to the vacated counts and then in its discretion make the sentences on Count 3 and the then restored counts run concurrently or consecutively. In either case the judgments will be subject to appellate review. Were the sentences imposed to run consecutively on some counts, this Court could then examine the convictions as to those counts only and refuse to review where concurrent sentences had been imposed (United States v. Newton, 9 Cir., 442 F.2d 622, decided May 11, 1971; United States v. Washabaugh, 9 Cir., 442 F.2d 1127, decided April 28, 1971), or it could review the concurrent sentences if it thought that they visited upon the defendant adverse collateral consequences. (Benton v. Maryland, 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969); United States v. Washabaugh, *supra*).

This appeal as it relates to the counts as to which judgments are vacated bristles with difficult legal and factual problems. The factual problems arise on an unindexed record [2] consisting of 2,154 pages and about 240 exhibits. To get to the merits we would need to examine the record to determine the sufficiency of the evidence as to each count. We

---

1. *See* the concurring opinion of Justice Jackson in Krulewitch v. United States, 336 U.S. 440, 69 S.Ct. 716, 93 L.Ed. 790 (1949). *See also* Judge Ely's separate concurring opinion in United States v. Vaught, 434 F.2d 124, 125 (9th Cir. 1970).

2. In this regard the record is prepared without any semblance of compliance with Rule 4(d), par. 2 of the Rules of this Court.

would be largely unaided by the briefs [3] which attempt to deal with the factual problems in general terms and without transcript references to the items of evidence which prove the separate elements of each count. By this order appellant loses nothing and the Government loses only the additional record of conviction of a man already convicted of offenses arising out of the same general transaction. Under these circumstances we believe that the interests of justice are better served if this Court turns its attention to the many real and pressing problems before it which cry for an early solution, rather than to engage in the vast labor necessary to solve on this appeal what now appear to be almost academic problems. We take this course upon the authority of 28 U.S.C. § 2106 [4] adopting the considerations expressed in United States v. Hooper, *supra*.

We turn now to the asserted errors which would affect the convictions on Counts 1 and 3.

It is urged that the Government withheld exculpatory information from the defendant in violation of the rule of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). We heretofore remanded this case so that the District Court might determine factually whether there had been such a violation. On remand the District Court held a hearing, took evidence, and made findings of fact and conclusions to the effect that the defendant's rights under Brady v. Maryland, *supra* had not been violated. We agree with those findings.

 Complaint is made that there was a deliberate failure to keep Grand Jury minutes, depriving defendants of the right to know what transpired before the Grand Jury. There is no requirement that Grand Jury minutes be

reported (Loux v. United States, 389 F. 2d 911 (9th Cir. 1968), cert. den. 393 U. S. 867, 89 S.Ct. 151, 21 L.Ed.2d 135) even where there is a prior request therefor (United States v. Thoresen, 428 F.2d 654 (9th Cir. 1970)). In view of the broad rights of discovery which appellant was accorded in this case we see no reason to invoke the possible exception noted in United States v. Thoresen, *supra*.

 It is urged that because the indictment alleges a conspiracy to violate three separate statutory provisions it cannot be known in the absence of special interrogatories that the jury unanimously voted for conviction on any one of the three statutory provisions involved. It is true that the indictment does charge a conspiracy to violate 15 U.S.C. § 77q(a) (using the mails to defraud in the sale of securities), 15 U.S. C. § 77e (using the mails or instruments of interstate transportation to sell or deliver unregistered securities) and 18 U. S.C. § 1341 (mail fraud). The jury was charged that the conspiracy count involved violations of the substantive crimes described in the statutes above noted.

No request for special interrogatories was made to the trial court, but actually the verdict form which submitted the substantive counts to the jury performed the function of a special verdict. The jury found the defendant not guilty as to all of the substantive counts involving the sale and delivery of unregistered securities (15 U.S.C. § 77e). The jury did convict Fishbein on thirteen counts of fraud in the sale of securities (15 U.S.C. § 77q(a)) and on one count of mail fraud (18 U.S.C. § 1341). It is clear, therefore, that the jury believed that the defendant violated two of the statutes

---

3. There is but a token compliance by all parties with Rule 28 of the Rules of Appellate Procedure with respect to transcript references.

4. "The Supreme Court or any other court of appellate jurisdiction may affirm, modify, vacate, set aside or reverse any judg-

ment, decree, or order of a court lawfully brought before it for review, and may remand the cause and direct the entry of such appropriate judgment, decree, or order, or require such further proceedings to be had as may be just under the circumstances." (28 U.S.C. § 2106.)

defining the substantive offenses and did not violate the third. Under these circumstances we refuse to speculate that some jurors among the twelve who unanimously voted for acquittal on the 15 U.S.C. § 77e count based their conspiracy verdict upon a violation of the law which they had rejected as to the substantive counts and then failed to agree on the 15 U.S.C. § 77q and 18 U.S.C. § 1341 violations upon which they had agreed as revealed by the verdicts on the substantive counts.

■ It is urged that the failure of the trial court to instruct that the testimony of an accomplice should be viewed with caution requires a reversal although no request for such an instruction was made. No reason appears. why we should now depart from the rule that the failure to give such an instruction in the absence of a request is not plain error. United States v. Jones, *supra*.

It is urged that the argument of the United States Attorney, which was florid and studded with figures of speech, was so prejudicial as to require a reversal. If the argument was unfair, and we do not so find, we do not think that it had the effect of depriving the defendant of a fair trial and our judgment in this is confirmed by the fact that some defendants at whom the same argument was directed were acquitted by the jury and that the defendant Fishbein was acquitted on some of the counts in the indictment.

■ It is urged that the fine of $5,000.00 was excessive in view of the fact that a permitted fine under 18 U.S.C. § 1341 charging mail fraud is but $1,000.00. Counsel overlook the fact that the conviction on Count 1 is for conspiracy and that a fine up to $10,000.00 may be imposed (18 U.S.C. § 371).

■ Claim is made that the Court erred in limiting the cross-examination of the witness Joe Lampe. Had the cross-examination been pursued and had it been successful, it would have shown that Lampe, who managed HiwayHouse after Fishbein left, was not loyal, that

had he been loyal HiwayHouse might have prospered, and had it prospered there would as a practical matter have been no prosecution. The trial court was obviously correct.

■ Fishbein and Yordon were represented at the trial by the same attorney. It is now urged that there was a conflict of interest which requires a new trial. No request for separate counsel was made in the trial court and there is nothing to suggest that the defendants themselves did not agree upon and pay for the joint representation. Both defendants were ably defended and the record does not disclose any conflict of interest. Since both were charged with the conspiracy, it was in their joint interest to resist proof of the conspiracy. Since Fishbein was sought to be held on all of the substantive counts, except possibly Count 3 (which did not involve Yordon), on some sort of vicarious basis, it was in his interest to prove that Yordon was innocent of the substantive crimes with which he was charged. No conflict appears from the record. Neither Fishbein nor Yordon gave testimony incriminating the other. It is not error *per se* to deny the request of an accused for independent counsel (Glavin v. United States, 396 F.2d 725 (9th Cir. 1969); Watkins v. Wilson, 408 F.2d 351 (9th Cir. 1969)), and certainly until some conflict appears, a trial judge is not required to interfere with a relationship which the defendants have themselves created.

It is urged that the Court erred in instructing the jury that the stock was a security. Stock is by law a security (15 U.S.C., § 77b). In some cases there may be a question of fact whether a thing sold is a security (SEC v. C. M. Joiner Leasing Corporation, 320 U.S. 344, 64 S.Ct. 120, 88 L.Ed. 88 (1943); Roe v. United States, 287 F.2d 435 (5th Cir. 1961)), but there was no fact question here.

## AS TO YORDON

Leonard M. Yordon was convicted on Counts 1, 2, 4, and 8 of the same 22-

count indictment. The opinion dealing with Fishbein disposes of the contentions common to both defendants, and we consider here only those asserted errors peculiar to Yordon.

■ Yordon was employed as a minor executive at a salary ranging from $500.00 to $800.00 per month at HiwayHouse during the whole of the stock sales campaign. He made approximately 80 separate stock sales and received about $5,000.00 in commissions (in addition to salary). He used the prospectuses which had been prepared. Viewing the evidence in the light most favorable to the Government, the jury could infer from Yordon's close connections with the executives and the other salesmen and his own sales efforts that he was aware that the mail was used to solicit purchaser inquiries and that the post stock sale mailings were used for the purpose of maintaining a continuing relationship with the buyers, many of whom did in fact make additional purchases. All of the substantive counts were incorporated by reference into the conspiracy count. Count 8 refers to the Lenards, and as to them the record shows that they were solicited by mail to inquire about the stock and did so; that in June, 1962, they purchased 500 shares from Wagner, the Sales Manager, who after the sale wrote them a letter acknowledging the purchase price and mentioned the Tucson property as one of the assets of the Company. Later on Wagner and Yordon called upon the Lenards, told them that only a few shares of stock were unsold (which was not true) and that the stock would be put on the market as soon as the last share was sold. Yordon testified that he had given the Lenards a prospectus. As of that time the prospectus was false and Yordon knew it. The Lenards bought an additional 250 shares and Yordon received a commission on the sale. From all of this we believe the jury was warranted in finding that Yordon became a member of a continuing conspiracy and that the Lenard sale was accomplished as a result of that conspiracy.

We deem the evidence insufficient to support the convictions as to Counts 2, 4, and 8 of the indictment.

■ Count 2 charges an elaborate scheme to commit fraud in the sale of securities (15 U.S.C. § 77q(a) (1)) and names a number of individuals who bought stock. Yordon sold stock to some of these individuals. It is not alleged (although in some cases the proof shows the use of the mail) that there was any use of the mails as to any of the named individuals except one Helen Cook, and as to her it is specifically charged that the mails were used to deliver the stock certificate. The record does not show that the defendant had any connection with the Helen Cook sale or the mailing of the certificate to her, nor did he have any connection with Donato, the salesman who made the Cook sale, except their common employer.

With respect to Count 2, only if Yordon is vicariously liable for the acts of others can he be convicted. If he is vicariously liable it is because of his agreement to participate in the continuing fraud and it is that agreement which made him a part of the conspiracy and resulted in his conviction on Count 1. With respect to Count 8 (the Lenard sale) Yordon did not participate in the mailing which was completed long before he met the Lenards. Those mailings were not a part of the second sale to the Lenards unless related to it on the basis of a continuing scheme to defraud. It is on this basis that the conviction on Count 1 is sustained.

In short, everything which was required to be proved to support the conviction on Count 1 was required to be proved to support the conviction on Counts 2 and 8. Under these circumstances the substantive counts became merged in the conspiracy count under the exception to the general rule stated in Pinkerton v. United States, *supra*, as follows:

"There are, of course, instances where a conspiracy charge may not be added to the substantive charge. One

is where the agreement of two persons is necessary for the completion of the substantive crime and there is no ingredient in the conspiracy which is not present in the completed crime. See United States v. Katz, 271 U.S. 354, 355–356, 46 S.Ct. 513, 514, 70 L. Ed. 986; Gebardi v. United States, 287 U.S. 112, 121–122, 53 S.Ct. 35, 37, 77 L.Ed. 206."

Count 4 repeats by incorporation the scheme alleged in Count 2 and then describes the Montgomery sale. Yordon did make the Montgomery sale and there is evidence of fraud. Proof as to the use of the mails, however, fails.[5] On direct examination Mr. Montgomery testified that he received the stock certificates through the mail. In answering a questionnaire used by the SEC in investigating the HiwayHouse matter, Mrs. Montgomery had stated that the stock was delivered in person. Confronted with her statement Mr. Montgomery on cross-examination testified:

"Q. Does that indicate that your stock was delivered by somebody, rather than having received it through the mail?

"A. It indicates that, yes sir.

"Q. Having looked at that, does that refresh your memory as to the way you got the stock—I mean the means of delivery?

"A. I believe, I am not positive, but I believe it came by mail.

"Q. But the statement in that questionnaire is not correct, that it in fact came by mail?

"A. I don't know.

"Q. You are not for sure?

"A. I am not for sure."

There is nothing in the circumstances of the case which tends to confirm a mail delivery. The Montgomerys lived in Phoenix and some HighwayHouse communications were hand delivered to them. The HiwayHouse stock sales were centered in Phoenix and hand deliveries of stock certificates were often made to residents of that city. The jury had nothing but Montgomery's memory to rely upon and if he was unsure, then an essential of the crime was not shown beyond a reasonable doubt.

As to Fishbein the judgment is affirmed as to Counts 1 and 3, and it is ordered that the judgment of conviction as to Counts 2, 4 to 8, 10 to 15, and 21 be vacated to be reinstated in the discretion of the district court in the event of a violation of probation as to Count 3.

As to Yordon the judgment is affirmed as to Count 1 and reversed as to Counts 2, 4, and 8.

---

5. Yordon argues that the mailing of a stock certificate after fraud has been accomplished is not sufficient under the statute. It is not necessary for us to reach that problem.