**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Jose Martin BARKER,**
**Defendant-Appellant.**

**No. 80–1853.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Sept. 10, 1981.

Decided April 28, 1982.

---

Frank Ragen, San Diego, Cal., for defendant-appellant.

Robert Rose, Asst. U. S. Atty., on the brief; M. James Lorenz, U. S. Atty., San Diego, Cal., for plaintiff-appellee.

Before CHOY, Circuit Judge, KASHIWA,[*] Associate Judge, and REINHARDT, Circuit Judge.

PER CURIAM.

Jose Martin Barker appeals his conviction of assault on a federal officer (Counts One and Two), deprivation of civil rights (Count Three), making false statements to the Immigration and Naturalization Service (INS) (Count Four), and perjury before a grand jury (Counts Five and Six), in violation of

[*] Honorable Shiro Kashiwa, Associate Judge, United States Court of Claims, sitting by designation.

18 U.S.C. §§ 111, 242, 1001, and 1623 (1976), respectively. Barker was sentenced to one year of imprisonment on each of the six counts, the sentences to be served concurrently. On appeal, Barker argues that the district court erred in denying his motions to dismiss the indictment and to sever the perjury counts. He also urges as to count four that the denials contained in the affidavit alleged to be false did not constitute a "false statement," or relate to a matter within the jurisdiction of the INS, for purposes of 18 U.S.C. § 1001.

In late 1979, the INS launched an investigation in response to numerous allegations of civil rights violations occurring at the Border Patrol Checkpoint at San Clemente, California. Agents Javier Dibene and Juan Espinal participated in the investigation conducted by the INS Office of Professional Responsibility.

Operating undercover, Dibene and Espinal posed as illegal aliens and boarded a bus in Oceanside, California on April 8, 1981. Dibene carried a counterfeit I–151 card. At 2:30 a. m., the bus was stopped at the San Clemente checkpoint. Border Patrol Agent Fullen boarded the bus, questioned Dibene and Espinal regarding their citizenship, and took the two undercover agents into the checkpoint station.

Fullen took Dibene into a processing room, patted him down, questioned him, and then placed him in a detention cell. There, Dibene deliberately drew attention to his counterfeit I–151 card. The detention officer returned Dibene to the processing room, where he remained locked for an hour, and gave the card to Fullen.

Barker entered the room while Fullen was questioning Dibene and was shown the card. Barker asked Dibene repeatedly where he had gotten the card. Finding Dibene's responses unsatisfactory, Barker became angry and slammed Dibene against the wall of the room several times. Barker then raised a chair over his shoulder as if he

were about to hit Dibene in the head with it, telling Dibene that he was going to "bust his head wide open." Barker then left the processing room.

On April 21, 1980, the INS furnished Barker with written notice of the "opportunity" to furnish a sworn statement in response to "[t]he allegation that you physically abused an individual ... by grabbing him by the shoulders and slamming him against the wall three times, and then in a threatening manner you raised a chair over your head as if to strike [him]." Barker presented a written response to the INS on April 23, 1980. The statement read, in part: "The man I remember as [Dibene] was in the station at the same time. My contact with him was only incidental and at no time did I touch him as alleged."

Barker subsequently testified before a grand jury investigating activities at the San Clemente checkpoint. He denied both slamming Dibene against a wall and threatening him with a chair.

At his trial, Barker denied assaulting Dibene. He testified that he had acted on the advice of counsel in preparing his written statement to the INS and in responding to questions before the grand jury. He further testified that he did not intentionally make any misstatements in his testimony before the grand jury.

### I.

Prior to trial, Barker moved to dismiss the indictment on the ground that only eight of the eighteen grand jurors who voted for a true bill attended all of the sessions at which evidence was presented.[1] The district court denied the motion.

Subsequent to the trial court's ruling, this court reversed the decision on which Barker relied below. *United States v. Leverage Funding Systems, Inc.*, 637 F.2d 645 (9th Cir. 1980), *cert. denied*, 452 U.S. 961, 101 S.Ct. 3110, 69 L.Ed.2d 972 (1981). Therein

---

1. The grand jury that indicted Barker held 12 sessions at which evidence was taken. Of the 18 grand jurors who voted unanimously to indict, eight were present at each session at which evidence was taken. Of the remaining ten grand jurors, six did not attend one session, two did not attend two sessions, and two did not attend three sessions.

we held that "[n]othing requires that every [grand] juror voting to indict attend every session." *Id.* at 649.[2] On appeal, Barker acknowledges *Leverage Funding*, but contends that a different result should obtain when the grand jury considers a charge of perjury. He argues that because a perjury charge rests on the grand jurors' determination of the credibility of the prospective defendant as opposed to the credibility of other witnesses, it is necessary in perjury cases for each grand juror to observe the demeanor of the witnesses.

■■■ *Leverage Funding* is dispositive here. We are bound by the presumption regarding grand juror attendance established in that decision. As in *Leverage Funding*, we are confronted here only with "the possibility that an absent juror" did not hear sufficient evidence on a particular count. *Leverage Funding* requires that, in the absence of contrary evidence, we presume that "grand jurors have properly performed their duties" and that "a grand juror who votes to indict an individual on a particular count has heard sufficient evidence." *Id.* Thus, whether or not the rule regarding the necessity for a grand juror to hear specific witnesses is different in perjury cases, or more particularly, in cases where the act of perjury allegedly occurs before the grand jury, we must presume, in the absence of contrary evidence, that the grand jurors voting to indict here heard all the evidence on the perjury counts they were required to hear in order to perform their duties properly. Accordingly, we affirm the district court's refusal to dismiss the indictment.

## II.

Prior to trial, Barker moved to sever the perjury and false statement counts from the remaining substantive counts. The district court denied the motion. Barker did not renew the motion during the course of trial. On appeal, he argues that the refusal to sever denied him a fair trial. He concedes that ample authority exists which allows the joinder of a perjury count with a substantive count, but asserts that none exists in which the perjury charge consists of a simple denial of the acts charged in the substantive counts.[3] Barker argues that the joinder of counts impermissibly informed the petit jury that neither the INS nor the grand jury believed his denial. This he contends served to impeach the testimony he gave on the substantive counts at trial. He also argues that allowing the government to utilize his testimony before the grand jury for purposes of its prosecution of the perjury counts compelled him to testify regarding the substantive offenses.

■■■ The government argues *inter alia* that Barker failed to preserve this issue on appeal because he did not renew the motion at the close of evidence. A motion to sever must be timely made and properly maintained. *United States v. Kaplan*, 554 F.2d 958, 965 (9th Cir.), *cert. denied*, 434 U.S. 956, 98 S.Ct. 483, 54 L.Ed.2d 315 (1977). If the motion is not diligently pursued at trial, it will be considered waived for purposes of appeal. *United States v. Burnley*, 452 F.2d 1133, 1134 (9th Cir. 1971). Ordinarily, in order to preserve the point on appeal, the motion must be renewed at the close of evidence, *United States v. Figueroa-Paz*, 468 F.2d 1055, 1057 (9th Cir. 1972), although "[t]his requirement is not an inflexible one." *Kaplan*, 554 F.2d at 965. Here, Barker failed to renew his motion both dur-

---

**2.** In *Leverage Funding*, we determined that an indictment satisfied the fifth amendment and Fed.R.Crim.P. 6(a) & (f) where: "(1) the grand jury returning the indictment consisted of between 16 and 23 jurors, (2) every grand jury session was attended by at least 16 jurors, and (3) at least 12 jurors vote to indict." 637 F.2d at 649. In the present case, a grand jury consisting of 18 jurors unanimously voted to indict. Barker does not contend that fewer than 16 jurors attended each session.

**3.** The substantive counts of the indictment charged Barker with assaulting Javier Dibene. The false statement and perjury counts, which Barker sought to sever from the substantive counts, charged that he knowingly and falsely denied the assault in a written statement to the INS (Count Four) and in testimony before the grand jury (Counts Five and Six).

ing and at the close of trial. Accordingly, we hold that he waived the motion for purposes of appeal.

### III.

■ Barker's remaining arguments are addressed solely to his conviction on count four, making false statements to the INS, in violation of 18 U.S.C. § 1001. The government urges that we summarily affirm the conviction on count four under the concurrent sentence doctrine. *United States v. Ford*, 632 F.2d 1354, 1365 (9th Cir. 1980), *cert. denied*, 450 U.S. 934, 101 S.Ct. 1399, 67 L.Ed.2d 369 (1981); *United States v. Martin*, 599 F.2d 880, 887 (9th Cir.), *cert. denied*, 441 U.S. 962, 99 S.Ct. 2407, 60 L.Ed.2d 1067 (1979). We do so. As previously noted, Barker was sentenced to one year on each of the six counts of which he was convicted, the sentences on all counts to be served concurrently. We have concluded that five of Barker's six concurrent one year sentences must be affirmed and can foresee no adverse collateral legal consequences which will result from our use of the concurrent sentence doctrine as to the sixth.

AFFIRMED.

REINHARDT, Circuit Judge, concurring.

I join in the per curiam opinion. However, with respect to the use of the concurrent sentence doctrine,[1] I do so reluctantly

and only because the defendant did not oppose the government's suggestion that it be applied.[2] I believe that some explanation of the reasons for my reluctance is required.

Since *Benton v. Maryland*, 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969), the law with respect to the concurrent sentence doctrine has been in a state of confusion. In *Benton*, the Court held that the doctrine does not constitute a jurisdictional bar to review. *Id.* at 791, 89 S.Ct. at 2060. However, the Court said that "[t]he concurrent sentence doctrine has been widely, if somewhat haphazardly, applied in this Court's decisions," and that those decisions provide no "satisfactory explanation" for the existence of the doctrine. *Id.* at 789, 89 S.Ct. at 2059.[3] While the Court remarked, without deciding, that the doctrine "may have some continuing validity as a rule of judicial convenience," *id.* at 791, 89 S.Ct. at 2060, its statement that " 'most criminal convictions do in fact entail adverse collateral legal consequences,' " *id.* at 790, 89 S.Ct. at 2060, quoting *Sibron v. New York*, 392 U.S. 40, 55, 88 S.Ct. 1889, 1898, 20 L.Ed.2d 917 (1968), seriously undermined the utility of the doctrine and resulted in a growing reluctance to invoke it.[4]

Some circuits are growing more inclined to review the merits of a conviction rather than to utilize the concurrent sentence doctrine.[5] This practice serves to protect the

1. *In United States v. Martin*, 599 F.2d 880 (9th Cir.) *cert. denied*, 441 U.S. 962, 99 S.Ct. 2407, 60 L.Ed.2d 1067 (1979), we described the doctrine as follows:

   [T]he appellate court, as a matter of discretion, may decline to review a conviction under one count if a conviction under another count is affirmed and the sentence runs concurrently and no adverse collateral legal consequences for the appellant result from the additional conviction.

   *Id.* at 887.

2. Barker did not discuss the applicability of the concurrent sentence doctrine in his opening brief. In its responsive brief, the government addressed on the merits each of the issues Barker raised, but suggested, in a brief footnote, that we invoke the concurrent sentence doctrine and summarily affirm on Count Four.

Barker did not file a reply brief. Oral argument was waived at Barker's request.

3. For a discussion of the development of the concurrent sentence doctrine prior to *Benton,* see Note, *The Federal Concurrent Sentence Doctrine*, 70 Colum.L.Rev. 1099, 1100–04 (1970).

4. Nonetheless, in a decision subsequent to *Benton*, the Supreme Court summarily invoked the concurrent sentence doctrine. *Barnes v. United States*, 412 U.S. 837, 848 n.16, 93 S.Ct. 2357, 2364 n.16, 37 L.Ed.2d 380 (1973). *See also Andresen v. Maryland*, 427 U.S. 463, 469 n.4, 96 S.Ct. 2737, 2742 n.4, 49 L.Ed.2d 627 (1976).

5. The Second Circuit has observed in several cases that, in that circuit, "utilization of the concurrent sentence doctrine is now the exception rather than the rule." *United States v.*

rights of the defendant but frequently results in a waste of judicial resources and adversely affects the rights of other litigants by needlessly contributing to the delay in processing other cases. However, as the Second Circuit has said, the continued use of the concurrent sentence doctrine results in a similar waste of judicial resources (with the same adverse effect upon others) in view of the need to carefully analyze the "collateral consequences" issue on a case by case basis. *United States v. Vargas*, 615 F.2d 952, 960 (2d Cir. 1980).[6]

The number of cases which circuit judges are required to consider and dispose of annually is staggering. This is true throughout the country. In our circuit each active circuit judge considers and participates in the disposition of approximately 270 cases per year.[7] This means more than one case per working day. Many of the cases are complex and require thorough opinions. Some are comparatively uncomplicated and may be disposed of by reasoned memoranda dispositions. All, however, are of importance to the litigants and require thorough and careful consideration and review. It is difficult to understand how the judicial function can be performed properly with the rate of dispositions we are compelled to maintain. Nevertheless, it is essential that appeals be resolved as promptly as possible; unnecessary delay works a hardship on the litigants and society. Given these facts, we must be willing to consider the use of rules

or techniques designed to avoid the waste of judicial resources while fully protecting the rights of all parties and society.

The concurrent sentence doctrine is one of those techniques. However, as the Second Circuit noted, if applied with the required degree of care, it does not result in any significant saving of judicial resources. There is also a serious question whether it adequately protects the rights of defendants. The doctrine is premised on our belief that when we fail to review a conviction under that doctrine we are not adversely affecting the defendant. We cloak our conclusion in the term "no adverse collateral legal consequences,"[8] a term which does not necessarily answer the question whether the defendant in fact suffers adverse consequences from our failure to review his case.

There is a troublesome aspect to the premise which underlies our use of the concurrent sentence doctrine. If it is truly of no consequence to the defendant that his conviction on an additional offense stands, why is it of consequence to the government that the conviction be affirmed? If the conviction is of no significance whatsoever, what is our purpose in upholding it? On the other hand, if the conviction has any significance at all, it would seem that the defendant has a right to have it reviewed on appeal. Assuming that there are no

---

*Ruffin*, 575 F.2d 346, 361 (2d Cir. 1978); *United States v. Wishart*, 582 F.2d 236, 242 n.8 (2d Cir.), *cert. denied*, 439 U.S. 987, 99 S.Ct. 582, 58 L.Ed.2d 660 (1978). *See also Close v. United States*, 450 F.2d 152, 155 (4th Cir. 1971), *cert. denied*, 405 U.S. 1068, 92 S.Ct. 1513, 31 L.Ed.2d 799 (1972); *United States v. Jones*, 533 F.2d 1387, 1390 (6th Cir. 1976), *cert. denied*, 431 U.S. 964, 97 S.Ct. 2919, 53 L.Ed.2d 1059 (1977); *Gentry v. United States*, 533 F.2d 998, 1000–01 (6th Cir. 1976); *United States v. Tanner*, 471 F.2d 128, 140 (7th Cir.), *cert. denied*, 409 U.S. 949, 93 S.Ct. 269, 34 L.Ed.2d 220 (1972); *United States v. Kilpatrick*, 458 F.2d 864, 867–68 (7th Cir. 1972). *But see United States v. McLeod*, 493 F.2d 1186, 1189 n.1 (7th Cir. 1974). For a discussion of the concurrent sentence doctrine in the federal courts in the aftermath of *Benton, see* Note, *The Concurrent Sentence Doctrine After Benton v. Maryland*, 7 U.C.L.A.—Alaska L.Rev. 282 (1978).

**6.** In *Vargas*, the court canvassed the various collateral consequences that might flow from the affirmance of an unreviewed conviction and observed that its "specific analysis demonstrates how much uncertainty and judicial time and effort are involved in any review of the risk of collateral consequences, . . . judicial time and effort that reduce any 'convenience' flowing from the doctrine." 615 F.2d at 960.

**7.** *See* Administrative Office of the United States Courts, Federal Judicial Workload Statistics for Twelve Month Period Ended September 30, 1981, Table B1, at A–3; Administrative Office of the United States Courts, 1981 Annual Report of the Director, Table 8, at 51.

**8.** *See supra* note 1.

particular consequences flowing from a conviction which for reasons of judicial convenience we decline to review, I would think it more consistent with the concept that a defendant is innocent until proven guilty to vacate the conviction than to affirm an individual's guilt without affording him his right to appeal.

In my opinion, the continued use of the concurrent sentence doctrine can be justified, if at all, only if (1) there is a particular identifiable governmental interest in preserving the additional convictions, (2) the additional convictions in fact have no effect on the defendant, and (3) the governmental interest outweighs the disserve to our system of justice which results from courts saying, in effect: a conviction stands because we are too busy to decide whether the finding of guilt was lawful or unlawful. While I am not here concluding that the concurrent sentence doctrine should be totally abandoned, I suggest that two serious problems with its continued use are apparent: One, it is far from clear that the defendant who is denied review of his conviction is not adversely affected,[9] and two, the courts have not thus far sufficiently identified the particular governmental interest that would justify the use of the doctrine. If that particular governmental

interest were carefully explained and analyzed, we might better understand what the actual consequences for the defendant are, and we might be able to determine more easily whether the doctrine is in fact consistent with our basic concept of justice.

The District of Columbia Circuit has adopted an approach which may avoid some of these troublesome questions and best serve all of the interests involved. In *United States v. Hooper*, 432 F.2d 604 (D.C.Cir. 1970), the court said that rather than affirm a conviction under the concurrent sentence doctrine, it would vacate the conviction but permit the government to seek reinstatement if and when it became of practical significance. *Id.* at 606 & n.8. The District of Columbia Circuit has employed the *Hooper* approach with regularity.[10] This approach has been applied in other circuits, including ours, on an *ad hoc* basis. *See, e.g., United States v. Morisse*, 660 F.2d 132, 137 (5th Cir. 1981); *United States v. Fishbein*, 446 F.2d 1201, 1205 (9th Cir. 1971), *cert. denied*, 404 U.S. 1019, 92 S.Ct. 683, 30 L.Ed.2d 667 (1972).[11]

I see much to commend the *Hooper* approach and might have been inclined to follow it here, had Barker suggested that we do so and had the government had the opportunity to brief the issue. While I

---

**9.** *See* discussion in *Vargas*, 615 F.2d at 959–60.

**10.** *See, e.g., United States v. Bush*, 659 F.2d 163, 167–68 (D.C.Cir.1981); *United States v. Durant*, 648 F.2d 747, 752 (D.C.Cir.1981); *United States v. Coleman*, 631 F.2d 908, 915 (D.C.Cir.1980); *United States v. Harris*, 627 F.2d 474, 477 (D.C.Cir.), *cert. denied*, 449 U.S. 961, 101 S.Ct. 375, 66 L.Ed.2d 229 (1980); *United States v. Peters*, 587 F.2d 1267, 1277 (D.C.Cir. 1978); *United States v. Caldwell*, 543 F.2d 1333, 1367 (D.C.Cir.1974), *cert. denied*, 423 U.S. 1087, 96 S.Ct. 877, 47 L.Ed.2d 97 (1976); *United States v. Gower*, 503 F.2d 189, 192 (D.C. Cir.1974); *United States v. Greene*, 489 F.2d 1145, 1158 (D.C.Cir.1973), *cert. denied*, 419 U.S. 977, 95 S.Ct. 239, 42 L.Ed.2d 190 (1974); *United States v. Harrison*, 461 F.2d 1209, 1212 (D.C.Cir.1972); *United States v. Bobbitt*, 450 F.2d 685, 693–94 (D.C.Cir.1971).

**11.** Our approach to the concurrent sentence doctrine has been less than uniform. When invoking the doctrine in some cases, we have made a specific finding with regard to the absence of collateral consequences. *See, e.g.,*

*United States v. Lipps*, 659 F.2d 960, 962–63 (9th Cir. 1981); *United States v. Young Buffalo*, 591 F.2d 506, 512–13 (9th Cir.), *cert. denied*, 441 U.S. 950, 99 S.Ct. 2178, 60 L.Ed.2d 1055 (1979); *United States v. Diaz-Alvarado*, 587 F.2d 1002, 1005 (9th Cir. 1978), *cert. denied*, 440 U.S. 927, 99 S.Ct. 1261, 59 L.Ed.2d 482 (1979); *United States v. Walls*, 577 F.2d 690, 699 (9th Cir.), *cert. denied*, 439 U.S. 893, 99 S.Ct. 251, 58 L.Ed.2d 239 (1978); *United States v. Moore*, 452 F.2d 576, 577 (9th Cir. 1971). In another line of cases, we have invoked the rule mechanically, without reference to or apparent determination of the existence of collateral consequences. *See, e.g., United States v. Ponticelli*, 622 F.2d 985, 992 (9th Cir.), *cert. denied*, 449 U.S. 1016, 101 S.Ct. 578, 66 L.Ed.2d 476 (1980); *United States v. Jabara*, 618 F.2d 1319, 1329 (9th Cir.), *cert. denied*, 446 U.S. 987, 100 S.Ct. 2973, 64 L.Ed.2d 845 (1980); *United States v. Thomas*, 586 F.2d 123, 131 (9th Cir. 1978); *United States v. Adams*, 581 F.2d 193, 200 (9th Cir.), *cert. denied*, 439 U.S. 1006, 99 S.Ct. 621, 58 L.Ed.2d 683 (1978).

1062

believe that in our circuit we are presently free to adopt whatever approach to the concurrent sentence doctrine a particular case seems to warrant, I do not think that so haphazard a policy is desirable. I believe that when a proper case arises we should carefully consider the question of the *Hooper* rule and the concurrent sentence doctrine and, after thorough argument by interested parties, decide what we believe the proper procedure to be and follow it uniformly.[12]

AFFIRMED.

12. The Fifth Circuit recently granted an en banc hearing to consider its policy with regard to use of the concurrent sentence doctrine. *United States v. Warren*, 612 F.2d 887 (5th Cir.) (en banc), *cert. denied*, 446 U.S. 956, 100 S.Ct. 2928, 64 L.Ed.2d 815 (1980). The majority decided, however, that the case before it "is no longer a vehicle for consideration of the policies underlying the concurrent sentence doctrine." *Id.* at 889. In a concurrence and dissent, several members of the Fifth Circuit expressed vigorous disagreement with the majority's failure to resolve the question, emphasized the "widespread haphazard" application of the doctrine, explained the necessity for arriving at a uniform policy within the circuit, noted that development of such a policy was "an appropriate role for the *en banc* Court," and urged that "careful consideration" be given to the adoption of the *Hooper* rule. *Id.* at 891–96.